PETERS, APPELLEE, *v.* THE B. & F. TRANSFER CO., APPELLANT.

[Cite as Peters v. B. & F. Transfer Co., 7 Ohio St. 2d 143.]

144

(No. 39592—Decided July 27, 1966.)

146

*Messrs. Dudnik, Komito, Nurenberg, Plevin, Dempsey & Jacobson* and *Mr. Marshall I. Nurenberg,* for appellee.

*Messrs. Johnson, Weston, Hurd, Fallon, Sullivan & Paisley, Mr. S. Burns Weston* and *Mr. R. William Rosenfeld,* for appellant.

MATTHIAS, J. The determination of the issues in the instant case requires a review of the evidence. The obligation of review of the evidence is primarily in the Court of Appeals. Unfortunately, in the instant case the Court of Appeals did not render an opinion and gave no reasons for the judgment stated in its journal entry.

In view of this, we are disposed to render the following opinion, stating the basis we consider determinative for the judgment we think proper without recourse to any particular point of error, for the Court of Appeals has specified none.

"Upon motion to direct a verdict the party against whom the motion is made is entitled to have the evidence construed most strongly in his favor. But if upon any essential issue, after giving the evidence such favorable construction, reasonable minds can come to but one conclusion and that conclusion is adverse to such party, the judge should direct a verdict

against him." *Hamden Lodge* v. *Ohio Fuel Gas Co.*, 127 Ohio St. 469, paragraph three of the syllabus. Therefore, because this cause is before this court by virtue of a directed verdict against the plaintiff herein, we must assume the truth of plaintiff's evidence as shown in the record, grant such evidence its most favorable interpretation, and consider as established every material fact which such evidence tends to prove. *Burrow, Admx.*, v. *Porterfield, Admr.*, 171 Ohio St. 28, 30; *Wells* v. *Van Nort*, 100 Ohio St. 101, 103; *Higbee Co.* v. *Jackson*, 101 Ohio St. 75; *Hoyer, Admx.*, v. *Lake Shore Electric Ry. Co.*, 104 Ohio St. 467. In so doing, we are not unmindful of the general proposition of law stated for a unanimous court by Judge Stephenson in paragraph six of the syllabus in *J. C. Penney Co., Inc.*, v. *Robison*, 128 Ohio St. 626: "Under our law it is just as pernicious to submit a case to a jury and permit the jury to speculate with the right of citizens when no question for the jury is involved, as to deny to a citizen his trial by jury when he has the right."

The questions raised by this appeal may be stated as follows: (1) Could reasonable minds come to any conclusion other than that plaintiff was negligent per se for crossing over the center line of the highway upon which she was traveling; and (2), assuming that plaintiff was negligent per se, can reasonable minds come to any conclusion other than that the evidence presented does not warrant application of the doctrine of last clear chance?

The trial court answered both these questions adversely to plaintiff and directed a verdict for defendant at the conclusion of plaintiff's evidence, holding specifically that plaintiff's own evidence established her unexcused negligence which negligence was a proximate cause of the accident, and that the evidence further failed to establish that defendant's driver, Franks, had sufficient time or distance to bring his truck to a stop prior to the collision or deviate the course of his truck and so avoid the collision.

These two questions will be taken up in the order in which they are presented.

With regard to the first question, it is conceded that the automobile operated by plaintiff crossed over the center line

of U. S. Highway 42 before the collision, and that the collision occurred entirely within the northbound (defendant's) lane of travel. It is conceded further that plaintiff could give no explanation for crossing the center line other than a showing that a wet or icy spot covered her side of the road some 350 feet north of the point of impact. Under this set of facts, plaintiff clearly violated Sections 4511.25 and 4511.26, Revised Code, which impose a mandatory duty upon the operator of a vehicle to drive solely upon the right half of a roadway except under certain circumstances, none of which is applicable here.

These sections were enacted for the public safety and set unequivocal standards. Any unexcused failure to comply with these standards constitutes negligence per se under the rule pronounced in *Spalding* v. *Waxler*, 2 Ohio St. 2d 1, and the burden of proving the legal excuse rests upon the one who has violated the statute. In the instant case, plaintiff has made no showing whatsoever that something over which she had no control or an emergency not of her own making made it impossible for her to comply with the statutory duty. In fact plaintiff herself is unable to account for the happening and relies solely upon the independent testimony that there was a wet or icy spot on her side of the road. This evidence falls short of what is required to constitute a legal excuse. One who operates a motor vehicle is under a mandatory statutory duty to drive upon the right side of the roadway. The fact that a wet or icy spot may have caused plaintiff to lose control of her car is not a sufficient legal excuse to sanction her driving on the wrong side of the road in violation of Sections 4511.25 and 4511.-26, Revised Code. Therefore, reasonable minds could find only that plaintiff was negligent per se for crossing the center line; and, since the accident herein would not have occurred if plaintiff had not crossed the center line, such negligence was a direct and proximate cause of the accident, unless reasonable minds could find only that defendant's driver could have avoided the accident under the rules of the last-clear-change doctrine, for then the negligence of defendant rather than that of plaintiff would be the proximate cause of the accident and resulting injury. Therefore, the trial court was correct in directing a verdict on this count.

150

The second question poses a more difficult problem and will be determinative of plaintiff's case, for "where a plaintiff, by his own fault, has caused himself to be placed in a perilous situation, he may recover under the rule of the 'last clear chance,' notwithstanding his negligence, if the defendant did not, after becoming aware of plaintiff's perilous situation, exercise ordinary care to avoid injuring him." *Cleveland Ry. Co. v. Masterson*, 126 Ohio St. 42, paragraph one of the syllabus.

Defendant concedes, and its driver, Franks, admits, that he knew that plaintiff had placed herself in a perilous situation; and, therefore, the only question remaining is whether the trial court was correct in ruling that plaintiff's evidence fails to establish that Franks, in the exercise of ordinary care after he discovered plaintiff's peril, had either time to deviate or time to stop in order to avoid the collision.

The only evidence directly upon this point was elicited from Franks upon cross-examination by plaintiff. Franks unequivocably stated that when he saw plaintiff for the first time he was 200 to 300 feet on the downgrade from the top of the knoll, and that her car "was in a cross-wise position to the white line in the center of the road" and was skidding out of control. Franks testified further that he did not have time to deviate his path in order to avoid a collision; and that, while he did not *immediately* apply his brakes, he did so some 100 to 110 feet from the point of the collision and continued to brake until his vehicle came to a stop.

Plaintiff offered no testimony whatever to rebut, and, construing this testimony most strongly in her favor, the following is apparent: Franks first saw plaintiff in a position of peril when he was on the downgrade some 200 feet from the crest of the hill. It is stipulated that the crest of the hill is 360 feet from the point of impact, so Franks would then have been about 160 feet from the point of impact. Further, Franks applied his brakes 110 feet from the point of impact. Plaintiff's expert witness, a traffic engineer, testified that Franks could have made a full fast stop safely in 165.5 feet and, therefore, herself, negates the possibility that Franks could have avoided the accident by stopping. It is further evident from plaintiff's expert that plaintiff's position of peril (indicated by the skid-was to the effect that he did not see plaintiff until that time. marks of her car) continued for 3.2 seconds. Franks' testimony

In view of the foregoing, construing the evidence most strongly in favor of plaintiff, reasonable minds could come only to the conclusion that Franks could not have brought his truck to a full safe stop in time to avoid the collision and, in the exercise of ordinary care requisite to an emergency some 3.2 seconds in the future, could not have had time to safely deviate the course of his truck and avoid the collision. Thus, there was no evidence of defendant's negligence.

In conclusion, it may seem plausible to say that, when the court divides on an opinion, reasonable minds can come to different conclusions; and, therefore, an issue is presented for determination by a jury. However, this would require a unanimous decision in all courts concerned whenever a case involving a directed verdict presents itself. We are not prepared to saddle justice with such an impediment and reject any such contention.

For the foregoing reasons, the judgment of the Court of Appeals is reversed, and the judgment of the Court of Common Pleas is affirmed.

*Judgment reversed.*

TAFT, C. J., ZIMMERMAN and O'NEILL, JJ., concur.

SCHNEIDER and BROWN, JJ., concur in the syllabus but dissent from the judgment.

HERBERT, J., dissenting. This cause is of vast importance to the parties to the action, to the plaintiff, Mrs. Peters, because of her need of funds to finance hospitalization and continuing surgery by reason of the loss of both limbs by amputation and other serious and permanent injuries resulting from the collision; to the defendant by reason of financial demands should a heavy verdict be returned against it. Hence the rights of both parties should be jealously guarded.

The paramount question presented is:

Was a jury question raised in the trial court? Eleven judges (trial court, Court of Appeals and Supreme Court) have now reviewed the record. Six are of the opinion that jury questions are presented; five are to the contrary. Here reasonable minds have reached different conclusions—with the minority prevailing. The answer of the trial court was, *no*. The answer of the Court of Appeals was, *yes*. Certain legal questions are present in respect to the application of the law to the *facts* when

determined. Should these facts be ascertained by a jury or by the trial court?

Certain guidelines have been established by the Constitution and laws of Ohio and by former decisions of this court setting forth certain principles to be followed in the consideration of the question posed. The Constitution, *in specific language*, confers upon the Courts of Appeals the power and responsibility *to weigh the evidence.* (Section 6, Article IV, Constitution of Ohio.) No such specific power is granted to the Supreme Court. (Section 2, Article IV, Constitution of Ohio.) Its appellate jurisdiction in the case at bar is confined to the consideration of the questions ''of public or great general interest.''

*Hamden Lodge* v. *Ohio Fuel Gas Co.*, 127 Ohio St. 469, provides further guidelines such as those in paragraphs three and four of the syllabus:

''3. Upon motion to direct a verdict the party against whom the motion is made *is entitled to have the evidence construed most strongly in his favor.* But if upon any essential issue, after giving the evidence such favorable construction, reasonable minds can come to but one conclusion and that conclusion is adverse to such party, the judge should direct a verdict against him. [Emphasis added.]

''4. Where from the evidence reasonable minds may reach different conclusions upon any question of fact, such question of fact is for the jury. The test is not whether the trial judge would set aside a verdict on the weight of the evidence.''

Neither the majority opinion nor this dissent should indulge in speculation to determine the facts.

The following is quoted from the majority opinion:

''These sections [Sections 4511.25 and 4511.26, Revised Code, requiring vehicles to drive on the right side of a highway] were enacted for the public safety and set unequivocable standards. *Any unexcused failure* to comply with these standards constitutes negligence per se under the rule pronounced in *Spalding* v. *Waxler*, 2 Ohio St. 2d 1, and the burden of proving the legal excuse rests upon the one who has violated the statute. In the instant case, plaintiff *has made no showing whatsoever that something over which she had no control* or an emergency not of her own making made it impossible for her to

comply with the statutory duty." (Emphasis added.) *The record does not support* such conclusions.

Franks, defendant's driver, testified that to the north of the point of impact of the two vehicles, a distance estimated at about 250 to 350 feet, and on plaintiff's lane over which she had just passed, there was a patch of ice (not a "wet spot") on her side of the road, extending along the west curb, north and south, about 25 to 35 feet, and about seven to eight feet wide, and that it "froze that night." (R. 220 to 223.) It was a single isolated patch of ice formed from water flowing from the side of the road and freezing during the night.

At page 215 of the record, Franks testified as follows:

"Q. * * * From the time you first saw it [plaintiff's automobile] until the collision that Ford was constantly in your eyesight, wasn't it, Mr. Franks? A. That's right.

"Q. And in some way, spinning and sliding, it continued then on your side of the road until it reached the point of impact, did it not? A. That's right.

"Q. The entire distance from the time you first saw it until the impact. A. That's right."

At page 217 of the record the testimony of Franks continues:

"Q. But when you saw the Peters' automobile crosswise as it was in the center of the road, you knew, did you not, that there was—well, let me make sure I use the right word—you knew there was trouble, did you not? A. Yes, sir. I sensed there was trouble.

"Q. You saw from the position of the car and what it was doing that the car was out of control? A. That's right.

"Q. Now, at the point where you saw the Peters' car the first time that you have said was two to three hundred feet from the top of the knoll, at that point did you make any attempt to apply your brakes? A. When I saw the car the first time?

"Q. Yes, sir. A. Well, when I seen the car—

"Q. Please, Mr. Franks. * * * A. *No, I didn't at that time.*" (Emphasis added.)

Mrs. Peters, the plaintiff, testified that she was driving in a lawful manner, the road was clear, "perfect," and that as she approached the place where the collision occurred:

154

"Well, it [the automobile] zigzagged and then it went into the spin. I fought the wheel and tried to get it over, and suddenly it *shot into the northbound lane,* and then I went into a skid." (Emphasis added.)

In its answer, the defendant:

"Admits that plaintiff's automobile *was* being operated in a southerly direction on Route 42 [plaintiff's lane] ; that it went out of control *and crossed over into the northbound lane * * *."* (Emphasis added.)

The testimony, the circumstantial evidence and *the admissions in defendant's answer* establish without contradiction that when the plaintiff's car passed over the center line into the northbound lane it was *"out of control."*

It is an *"unexcused failure"* to drive on the right side of the road that constitutes negligence per se. (Paragraph two of the syllabus of *Spalding* v. *Waxler,* 2 Ohio St. 2d 1.) If such "failure" is excusable then there can be no negligence. It is a question for a jury under proper instructions to determine if the "failure" was excusable or unavoidable.

Judge Zimmerman expressed his views in the case of *Bird* v. *Hart,* 2 Ohio St. 2d 9, saying, at page 11:

"To my way of thinking, *whether a particular occurrence, involving a sudden, unexpected and unforeseen failure of motor vehicle equipment may constitute an unavoidable accident is a factual question for determination by the trier of the facts.* * * *"* (Emphasis added.)

In *Bird,* the defense was failure of *equipment.* The driver of an automobile certainly owes some duty to keep the operating equipment of his automobile in reasonably efficient condition. Judge Zimmerman took the position that, even where the mechanical equipment failed, a jury question was presented. In the case at bar the mechanical equipment of plaintiff's car was satisfactory, her car slid on a patch of ice—a situation over which she had absolutely no control—then went out of control and while out of control went over the center line.

The late Judge Williams, a former eminent member of this court, in the case of *Kohn, Admx.,* v. *B. F. Goodrich Co.,* 139 Ohio St. 141, expressed his opinion, at page 147, in this language:

"* * * By this turn of affairs the defendant was in the predicament that it might be found guilty of negligence per se by violating the statute even though the skidding of the truck to the left of the center was beyond the power of the truck driver to prevent. *A safety statute does not require the driver of a motor vehicle to do the impossible.* * * *" (Emphasis added.) Judges Turner, Matthias (Edward S.), Hart and Zimmerman concurred.

39 Ohio Jurisprudence 2d 557, Section 46, reads as follows:

"Excuse for Noncompliance with Statute or Ordinance.— It is recognized that the violation of a statute or ordinance with which compliance is impossible does not constitute negligence. The courts will not attempt to enforce the provisions of a statute which are impossible of fulfilment, for the courts will presume that the Legislature did not intend to do an absurd or impossible thing. However, *a legal excuse, precluding liability for injuries resulting from negligence per se in the failure to comply with a safety legislative enactment directing the manner of the operation of a motor vehicle on the public highway, must be something which makes it impossible to comply with the safety legislative enactment, something over which the driver has no control, an emergency not of the driver's making* causing failure to obey the statute, or an excuse or exception specifically provided in the enactment itself."

Factual questions which require a jury's attention.

60 Corpus Juris Secundum 659, Section 282, states the general rule in this language:

"Driving a motor vehicle on the wrong side of the road or street or in violation of a requirement to keep to the right-hand edge or curb *may be justified or excused by the particular circumstances of the case.*" (Emphasis added.)

In the discussion, Corpus Juris Secundum comments:

"* * * It has been held that statutory or other rules requiring the drivers of motor vehicles to keep to the right have no application where the failure to comply is without fault on the part of the driver * * * or where, through no fault of its driver, it skids on a slippery pavement and is thus thrown across the center line." In support is cited "*Kohn, Admx.,* v. *B. F. Goodrich Co.,* 38 N. E. 2d 592, 139 Ohio St. 141."

It appears from the majority opinion's own conclusion that defendant's driver was negligent and that he could have avoided the tragedy had he exercised reasonable care. The following is quoted from the majority opinion:

"* * * Franks first saw plaintiff *in a position of peril* when he was on the downgrade some 200 feet from the crest of the hill. It is stipulated that the crest of the hill is 360 feet from the point of impact, so Franks would have been about 160 feet from the point of impact. Further, Franks applied his brakes 110 feet from the point of impact." (Emphasis added.)

The majority, therefore, concedes that the driver of defendant's truck continued its course, without slackening the speed or making any effort to control the rig whatsoever, *50 feet after he knew that plaintiff was in a position of peril.*

Did the driver of the tractor-trailer outfit owe a duty to the plaintiff to exercise reasonable care immediately after he learned of plaintiff's peril, in order to avoid injuring her? Reasonable minds must conclude that he did owe plaintiff such a duty and his failure to exercise the requisite degree of care was negligence. A jury should be permitted to determine if this obvious negligence was the proximate cause of plaintiff's severe injuries.

Reasonable minds would look further into the record to determine what would probably have occurred had the driver of defendant's truck applied the brakes 160 feet from the point of impact when he fully realized plaintiff's peril. The evidence is definite that the truck driver could have brought the truck to a stop within 160 feet at the rate of speed that he claimed his tractor-trailer was traveling. The evidence reveals that one pressure on the footbrake would have applied individual brakes on each wheel of both the trailer and the tractor and caused the commencement of immediate deceleration or slowing down of the speed of the truck without causing any skidding. This deceleration would continue until the truck was brought to a stop just at or prior to the impact. Reasonable minds would conclude that the truck, moving very slowly as it approached a stop, could very easily have been turned aside, if necessary to avoid touching the plaintiff's Ford. But the driver did not stop. The evidence discloses (and this is not mentioned in the majority

opinion) that the defendant driver, instead of utilizing his full brakeage power to bring the truck to a stop or turning it slightly to one side, crashed into the automobile of plaintiff and knocked it 44 feet and ten inches and then continued on its course 102 feet and seven inches farther. This is the testimony of a member of the Highway Patrol taken from actual measurements made shortly after the collision. (R. 165.)

The evidence discloses further, without dispute, that there was available for the use of the driver at least two types of braking stops: (1) without skidding, which would bring the truck to a stop within 160 feet; and (2) an emergency stop, locking the wheels into a skid which would bring the truck to a stop within 140 feet. Both stopping distances, i. e., 160 feet for the nonskidding stop and 140 feet for the emergency stop, include perception, reaction and brake-lag time. The driver could have used the emergency stop without mishap and, had he applied the full braking power when he realized the peril of the plaintiff at a distance of 160 feet from the point of impact, it would have brought his truck to a stop within 20 feet of the point of impact.

Did defendant's driver owe a duty of care to the plaintiff to use the emergency brake? This is another question of fact requiring the weighing of evidence or testimony, determining credibility of witnesses and the taking into consideration all the facts and circumstances surrounding this unfortunate occurrence.

Further reference should be made to the phrase, "unexcused failure," as used in *Spalding* v. *Waxler, supra,* when the applicability of the doctrine of last clear chance is being considered. The general rule appears to be that when a factual question must be determined before a decision in respect to the propriety of the use of last clear chance, the question should be submitted to a jury under proper instructions. If, following such instructions, the jury finds that driving on the "wrong" side of the road is "excusable" as a matter of fact, then the plaintiff is free of negligence and the doctrine of last clear chance does not apply, as negligence of the plaintiff is a prerequisite to the doctrine's application. If plaintiff is not excused then negligence is attributed to her and the doctrine does

158

apply, which then requires the jury to determine if defendant was negligent and, if so, which party's negligence was the proximate cause of the damage or injury or did plaintiff's negligence, if proved, contribute to cause her injuries.

Among her allegations of negligence, plaintiff, in her petition, alleges that defendant failed to stop its tractor-trailer when the driver knew of the position of peril of plaintiff and had sufficient distance and time to do so.

The record discloses substantial probative evidence that the driver, by the exercise of ordinary care, could have brought the tractor-trailer to a slow nonskid type of stop within 160 feet without striking plaintiff's car; that, had the driver used an emergency stop—skidding type—the tractor-trailer could have been brought safely to a stop within 140 feet—being then at least 20 feet from plaintiff's car.

Plaintiff alleges further that defendant failed to divert the course of the tractor-trailer to avoid striking plaintiff. There is also substantial evidence that using the slow type of stop—one within 160 feet from the point of impact—deceleration of speed of the tractor-trailer would have caused it to move so slowly as it approached plaintiff's car that it would be a very simple matter to turn if there was any indication that plaintiff's car would be struck. It was also established that, had defendant's driver so desired, he could, at a distance of 118 feet from the point of impact, have changed his course at the speed at which said driver claimed that he was proceeding and, with safety, have passed the plaintiff's car and proceeded northerly.

Plaintiff testified that her car came to a stop cross-wise of the highway, with the motor stalled. She endeavored to start it, but failed. Her car was stationary four seconds before the crash. In that time—four seconds—taking the driver's testimony as to his speed, he should have seen the plaintiff at least 268 feet before the impact. It is conceded by the majority opinion that the driver had a clear view for at least 360 feet from the point of impact, yet he testified that he did not apply his brakes for 250 feet, i. e., that he applied his brakes when he was 110 feet from the point of impact.

The majority opinion states that the driver of the tractor-

trailer was not negligent. The record, at pages 217 and 218, of Franks' testimony, discloses the following:

"Q. *Did you make any attempt* at all between the time that you first saw the Peters' car until you reached the point of impact *to deviate your truck either to the right or to the left?* * * * A. No. I didn't.

"* * *

"The Court: Was there anything that prevented you from doing it, is that the question?

"Mr. Nurenberg: That is the question.

"A. The answer is, to that, I didn't have time.

"Q. That is the only reason? A. Yes, sir. That's the best reason I can give.

"* * *

"Q. Then if I understand you correctly, *other than the element of time, there was nothing to prevent you from deviating the truck either to the right or to the left?* A. *That's right.*

"* * *

"Q. What is your answer, sir? A. Will you repeat the question again?

"(Question read.)

"A. *Time was all.*

"Q. *That was all that prevented you?* A. *That's right.*" (Emphasis added.)

Thus the driver, himself, eliminated any danger of jack-knifing.

The majority passed upon the credibility of the witnesses. Until the decision in the case at bar, the jury was recognized as the *sole* judge of the credibility of the witness. 21 Ohio Jurisprudence 2d 708, Section 682, reads:

"* * * *The jurors* may give to the testimony of a witness much, little, or no weight. *They are the exclusive judges of the credibility of the witnesses,* for they have the opportunity to see and hear the several witnesses and observe their demeanor and conduct. In weighing the evidence of witnesses, the jury may take into consideration their means of knowledge, their good intentions, and their seeming honesty or lack of the same, in the light of all the surrounding facts and circumstances in the case on trial, their respective opportunities for seeing and

knowing the things about which they testify, their intelligence or want of intelligence, the accuracy of the witnesses' memory and of their recital of facts, the probability or improbability of their testimony, whether it is in itself reasonable and bears the mark of plausibility, *their interest or absence of interest* in the result of the suit, or their bias or prejudice for or against one or the other of the parties, which might color or affect their testimony. * * *'' (Emphasis added.)

The majority judged the credibility of the witnesses, ignoring testimony favorable to the plaintiff and construing most strongly the evidence in favor of the defendant contrary to the rule announced in *Hamden Lodge, supra.* The rule of *stare decisis* was forgotten in a welter of factual conclusions.

For example, Franks, the driver, who was vitally interested in the outcome of the case, gave, under oath, two widely differing estimates of the distance between two points: once while giving his deposition, and the other while testifying at the trial. When asked why he changed his testimony he gave a lame excuse. We will quote from the record, for fear of any misunderstanding, to show certain features of his testimony that certainly do not create unbounded confidence in his credibility. At page 200 *et seq.* of the record is the following:

''Q. And when you get to the top of the knoll your range of visibility is from a half to three-quarters of a mile, is it not? A. I would say that's about right. You mean down to the curve?

''Q. Well, the curve ends your range of visibility, doesn't it?

''* * *

''A. I could see down to the curve, yes.''

At this juncture the court interrupted to ask a question, as follows:

''The Court: How far is it, sir, in your estimation, from the top of the knoll to the beginning of the curve, the curve at the bottom of the downgrade?

''The witness: Oh, I would say about nine, ten hundred feet.''

The attention of the witness was then directed to his testimony given in his deposition. The witness admitted that the

following question and answer were correct as disclosed in the deposition, as follows:

"Question: 'When you got to the top of the knoll how far could you see straight ahead of you on the road?' Answer: 'Approximately I would say half, three-quarters of a mile.'"

He was then queried as to why he changed his testimony. At page 204, the record continues:

"Q. Now, has anything happened between the time of your deposition and today to cause you to want to change your testimony as to the range of vision, from the top of the knoll to the end of your range of vision? A. Well, the only thing that I—the reason I would want to change, from being measured and finding out it isn't no half a mile down there.

"Q. What are you talking about, the measurement, Mr. Franks? What kind of a measurement? Do you mean the measurement that's on this map that you saw Saturday? Is that what you're talking about? A. No, I don't—I didn't see that on there.

"Q. You didn't see what on there? A. The measurement.

"Q. What measurement are you talking about, Mr. Franks? A. Well, when them—someone was measuring that, I overheard them say it was nine to ten hundred feet from the top of the grade down.

"Q. You heard who say? A. I can't tell you who it was.

"Q. When did you hear him say it? A. Well, from the time we started—measured it—it was approximately nine to ten hundred down to this curve.

"Q. Well, I understand that. But when was this measurement made? A. I don't know.

"Q. You heard somebody call out, in reference to some kind of measurement, nine hundred to a thousand feet? A. Approximately, yes.

"Q. And were you there when they made the measurement? A. *No, I wasn't.*" (Emphasis added.)

The majority apparently placed complete confidence in the credibility of this witness without seeing him or hearing him. It adopts his testimony so far as it may be construed in favor of the defendant and against the plaintiff.

Contrary to the ruling made in *Hamden-Lodge, supra,* the

majority opinion ignores the testimony of the highway patrol-man or the obvious violence of the collision caused solely and only by the speed of the tractor-trailer; ignores reference to the testimony that the day of the occurrence was dry and clear, and only a single patch of ice was present and this was caused by water draining into the roadway the night before and then freezing.

The opinion criticizes plaintiff's expert, the traffic control officer of the Police Department of the city of Cleveland, a graduate of Notre Dame who had taken special courses in traffic control in other universities.

*Kohn, Admx.,* v. *B. F. Goodrich Co., supra,* states the law in the second paragraph of the syllabus, in this language:

"It is prejudicial error for the trial court, in an action for wrongful death alleged to have been caused by defendant's negligence, to instruct the jury at plaintiff's request that a violation of Section 6310-17, General Code (115 Ohio Laws 231) [Section 4511.25, Revised Code], which requires that motor vehicles shall keep to the right side of the center line of the highway, is negligence per se, without explaining to the jury in some instruction or in the general charge what would or would not constitute a violation of the statute."

In the case at bar, the trial court compounded error by excluding the jury entirely.

As heretofore pointed out in *Kohn,* at page 147, the court said:

"A safety statute does not require the driver of a motor vehicle to do the impossible."

In the case at bar, the majority opinion, in effect, holds that a driver who is without fault and his car slides across the center line, out of control, is not only guilty of negligence but of negligence per se. This is a strange doctrine. This court, in the case at bar, is endeavoring to require of the plaintiff that she should have done the impossible. The late eminent judges of this court, Turner, Hart and Edward S. Matthias (father of the writer of the majority opinion) and Judge Zimmerman, concurred in the statement that a safety statute could not properly require of a driver the impossible. The distinction between the reasoning of jurists in the past and that of the majority of

this court presently revolves about the necessity of jury participation in the solution of the problems presented by the record. Those jurists who fashioned the case law of Ohio up to the present time, as well as jurists in every other jurisdiction in the nation, consider that in the approach to the question it must be determined whether the crossing over to the left side of the center line of the highway was avoidable or unavoidable; whether it was occasioned by the fault of the driver or whether such movement of the car was beyond his control. It is the province of the trial court to instruct the jury as to the law in respect to its duty after its determination of the various questions of fact. For example, the trial court should define to the jury "unavoidable failure" to keep on the right side of the center line; then proceed to instruct the jury as to its duty in the event it finds the "failure" to have been unavoidable or on the contrary that the plaintiff was negligent. The jury, under proper instructions, may determine that the doctrine of the law of last clear chance applies or it may not, depending upon the facts and, of course, the instruction of the court upon the law.

Then follows the usual instructions upon negligence, contributory negligence, proximate cause and a final verdict.

More briefly, jurists of the past make a distinction between a "failure" to keep on the right side of the highway that is avoidable and one that is unavoidable. The majority concludes that the plaintiff, Mrs. Peters, is guilty of negligence per se whether she had control or whether she did not have control of her car, or whether she could have avoided the accident or whether it was unavoidable. There is presented a series of jury questions.

The structure of our procedure in the administration of justice is made quite simple by our state Constitution and the laws enacted relative to procedure. Basically a jury determines what the facts are. The court determines solely and only the questions of law.

The following authorities reflect the rule in Ohio, as well as that of jurisdictions throughout the country, upon the propriety of the use of directed verdicts, as follows:

52 Ohio Jurisprudence 2d 622, Trial, Section 122: "The

164

whole trend of judicial opinion in Ohio is to the effect that the right to trial by jury must be jealously guarded, for which reason, if the trial court has any doubt as to his right to grant a nonsuit or direct a verdict, the motion should be refused.''

52 Ohio Jurisprudence 2d 633, Trial, Section 124: ''[T]he evidence must be construed favorably to the submission of the case to the jury, and the trial judge should indulge in *every possible consideration* in favor of such submission.'' (Emphasis added.)

52 Ohio Jurisprudence 2d 637, Trial, Section 126: ''In other words, the trial judge, in passing upon a motion to direct a verdict or grant an involuntary nonsuit, *is not allowed to weigh the evidence*; but if there is present in the case evidence tending to maintain an issue, *it is the sole province of the jury, under instructions from the court as to questions of law, to decide upon the weight and credibility of the conflicting testimony.* A motion by the defendant for a directed verdict is properly overruled when the plaintiff has the right to go to the jury *on at least one of the issues presented.*'' (Emphasis added.)

52 Ohio Jurisprudence 2d 654, Trial, Section 138: ''Sufficiency of Evidence to Support Verdict.—Generally speaking, if there is evidence tending to establish the existence of the material facts, the trial judge is bound to submit the question to the jury, even though he may entertain the view that the evidence to the contrary is of greater weight or more convincing. In other words, a case cannot properly be withdrawn from the consideration of the jury simply because, in the judgment of the court, there is a preponderance of evidence in favor of the party asking a peremptory instruction.''

*Durbin* v. *Humphrey Co.*, 133 Ohio St. 367: Syllabus: ''A motion by defendant for a directed verdict, made at the close of plaintiff's evidence, raises a question as to the legal sufficiency of the evidence adduced to go to the jury, and should be overruled if the evidence is such that reasonable minds may differ as to the inferences to be drawn therefrom.''

Opinion, per Day, J., at page 370: ''Where it is doubtful whether reasonable minds would differ in their inferences from the evidence, the trial court should resolve the doubt against the movant.''

53 American Jurisprudence 281, Trial, Section 349: "A motion for a directed verdict invokes the consideration by the court of the validity of the assertion that the evidence is sufficient to support a verdict for the movant, and that reasonable men can reach no other conclusion. In deciding a motion for a directed verdict, the court must consider the evidence in a light most favorable to the party against whom the motion is directed; his evidence must be taken as true, every controverted fact must be resolved in his favor, and the strongest inferences reasonably deducible from the most favorable evidence should be indulged in his favor."

53 American Jurisprudence 292, Trial, Section 362: "The trial court should not assume to direct a verdict *when its ruling would require it to pass upon the credibility of witnesses* and waive testimony, or would require it to resolve conflicts in the evidence; whenever there is credible evidence from which a reasonable conclusion can be drawn in support of the claim of the party against whom the motion is made, the motion must be denied and the case submitted to the jury." (Emphasis added.)

53 American Jurisprudence 294, Trial, Section 365: "Conflict of Evidence.—While a mere scintilla of evidence in support of a claim is not ordinarily sufficient to require the trial court to overrule a motion for a directed verdict and submit the case to the jury, according to some courts it is not a sufficient ground for directing a verdict that the court would be obliged to set aside a contrary verdict as against the weight of evidence, and if there is any real issue of fact in the case a verdict cannot be directed. In any event, a verdict should not be directed on a mere preponderance of the evidence, or where the case is a close one on the evidence. It is only where the evidence upon any issue is all on one side or so overwhelmingly on one side as to leave no doubt what the fact is that the court should direct a verdict. In other words, if there is a conflict of the evidence or inferences, a verdict should not be directed."

53 American Jurisprudence 296, Trial, Section 366: "Possibility of Different Conclusions.—It is an established principle that if there is any credible evidence from which a reasonable conclusion can be drawn in support of the claim of either party in the trial of a case, the trial court should deny a motion to

direct a verdict against such party; the determination of such a case must be left to the jury. A verdict should not be directed if on all the facts and circumstances there is room for fair and sensible men to differ in their conclusions, or, as it is sometimes stated, if the evidence is not such that honest minds could reach only one conclusion. Whenever facts which would sustain the contentions of a party are put in evidence, together with other facts from which an inference unfavorable thereto may be drawn, the question should be left to the jury. Where a case involves an issue of fact on which the evidence is conflicting and would support a verdict for either party, such issue should be left to the jury. A verdict should not be directed unless under no circumstances could a verdict for the opposite party be sustained."

88 Corpus Juris Secundum 695, Trial, Section 259(a): "If there is a doubt, or any room for doubt, or if any question remains in the mind of the trial judge as to the ruling, a verdict should not be directed. Only when, conceding the truth of all testimony favorable to the adverse party, no other course is reasonably possible, or no other reasonable conclusion or inference is legally deducible, may the court direct a verdict * * *.
"* * *

"The mere fact that a contrary verdict would be against the great weight of the evidence, even to such an extent that the trial court might properly grant a new trial, does not authorize it to direct a verdict * * *."

88 Corpus Juris Secundum 705, Trial, Section 259(c): "The motion to direct may, should, or must be denied, where, accepting as true the evidence or testimony favorable to the adverse party, together with all reasonable inferences therefrom, it is sufficient to warrant or support a verdict in his favor and does not demand a finding for movant or require that a verdict to the contrary, if found, be set aside, even though such testimony may be unreasonable, inconsistent, or contradictory, if it is not impossible * * *."

In *Peters* v. *United Electric Rys. Co.* (1933), 53 R. I. 251, 165 A. 773, the Supreme Court of Rhode Island said:
"* * * It is universally recognized that a motor vehicle may begin to skid and get beyond the control of the driver, al-

though prior to the skidding the vehicle may have been operated with due and proper care," citing *Byron* v. *O'Connor*, 130 Me. 90, 153 A. 809; *Springs* v. *Doll*, 197 N. C. 240, 148 S. E. 251; *Moir* v. *Hart*, 189 Ill. App. 566; *Rango* v. *Fennell*, 168 N. Y. Supp. 646; *Lawrence* v. *Butler*, 79 Cal. App. 436, 249 P. 840; *Hammond, Admr.*, v. *Hammond*, 227 App. Div. 336, 237 N. Y. Supp. 557; *Bartlett, Exr.*, v. *Town Taxi, Inc.*, 263 Mass. 215, 160 N. E. 797; *Tucker* v. *City and County of San Francisco* (Cal. App.), 290 P. 924; *Hatch* v. *Robinson*, 99 Pa. Supp. 141; *Cartwright* v. *Boyce*, 167 Wash. 175, 8 P. 2d 968; *Philpot* v. *Fifth Ave. Coach Co.*, 142 App. Div. 811, 128 N. Y. Supp. 35; *Linden* v. *Miller*, 172 Wis. 20, 177 N. W. 909, 12 A. L. R. 665; *Siegl, Admr.*, v. *Watson*, 181 Wis. 619, 195 N. W. 867; *Heidt* v. *People's Motorbus Co. of St. Louis*, 219 Mo. App. 683, 284 S. W. 840.

In *Phoenix Refining Co.* v. *Powell* (1952), 251 S. W. 2d 892, 895, the Court of Civil Appeals of Texas made the following observation about the application of the negligence per se doctrine to "reasonable violators":

*"Negligence implies fault* and, 'If liability is to be extended beyond fault, the phrase "negligence per se" is, at least, a misnomer.'" (Emphasis added.)

Our research discloses the following citations in support of the universal rule:

Connecticut: *DeAntonio* v. *New Haven Dairy Co.* (1927), 105 Conn. 663, 668, 136 A. 567:

"* * * Failure to keep to the right when, *through no fault of the driver*, an automobile skids on a slippery pavement and is thus thrown across the road, has been held to excuse failure to comply with the statute." (Italics in original.)

*Herman, Admx.*, v. *Sladofsky* (1938), 301 Mass. 534, 538, 17 N. E. 2d 879 (construing Connecticut law):

"If we assume that crossing to the left of the road, under the circumstances [plaintiff's auto skidded on icy road so that half of the auto was on the left side of the road where defendant's oncoming truck collided with it] shown, was a violation of the statute and that it contributed to cause the accident, it does not follow that on the evidence in his case there was no question for the jury. Even those jurisdictions which generally apply the doctrine of negligence per se seem to recognize an

exception in cases where there is a merely technical violation of a traffic regulation which may, for the purposes of a civil case, be regarded as excused by peculiar emergencies or special conditions beyond the control of the driver by reason of which his violation may be found to have been without fault."

Minnesota: *Dohm* v. *R. N. Cardozo & Bro.* (1925), 165 Minn. 193, 197, 206 N. W. 377:

"* * * One's presence on the wrong side of the street is excused when without fault on his part the machine skids across the center line."

*Chase* v. *Tingdale Bros.* (1914), 127 Minn. 401, 402, 149 N. W. 654:

"* * * As to defendant's car not keeping to the right of the center of the street, plainly the statute has no application where a motor vehicle, through no fault of its driver, skids on a slippery pavement and is thus thrown across the center line."

Kentucky: *Hunt* v. *Whitlock's Admr.* (1935), 259 Ky. 286, 290, 82 S. W. 2d 364:

"The failure of the driver of a motor vehicle to keep to the right side of the center of a highway is excused where, without fault on his part, the vehicle skids across the center line * * *."

New York: *Gilfillan* v. *Grimm* (1935), 154 Misc. 575, 278 N. Y. Supp. 569.

Pennsylvania: *Davin, Admx.,* v. *Levin* (1947), 357 Pa. 554, 55 A. 2d 364.

Illinois: *Bradley* v. *Thomas M. Madden Co.* (1947), 333 Ill. App. 153, 76 N. E. 2d 797.

Washington: *Wilson* v. *Congdon* (1934), 179 Wash. 400, 402, 37 P. 2d 892:

"The failure of the driver of a motor vehicle to keep to the right side of the highway is excused where, without fault on his part, the machine skids across the center line of the road, but, where skidding results from negligence, the driver is liable. * * *"

Michigan: *Leonard* v. *Hey* (1934), 269 Mich. 491, 494, 257 N. W. 733:

"It is fundamental law that the driver of a car must keep on the right side of a street or highway, but failure to keep to

the right when, through no fault of the driver, an automobile skids on a slippery pavement and is thus thrown across the road, has been held to excuse failure to comply with the statute.''

South Dakota: *Vaughn* v. *Payne* (1954), 75 S. D. 292, 295, 63 N. W. 2d 798:

'' * * * And it is generally recognized that a mere technical violation of a traffic regulation is not in itself negligence * * *. In conformity to this rule it is held that no actionable negligence results when, through no fault of the driver, an automobile skids on slippery pavement and is thus thrown across the center line of the road.''

Wisconsin: *Linden* v. *Miller* (1920), 172 Wis. 20, 22, 177 N. W. 909:

'' * * * If it be true, as the defendant claims it was, that he was driving along near the center of the street at a moderate rate of speed, when his car began to skid [toward the left side], and that by the exercise of ordinary care he was unable to control it until it struck plaintiff's car; *then the jury might well find that it was an unavoidable accident.*'' (Emphasis added.)

West Virginia: *Sigmon, Admx.,* v. *Mundy* (1943), 125 W. Va. 591, 595, 25 S. E. 2d 636.

The same rule is implied in the following three cases:

Maryland: *Christ, Admr.,* v. *Wempe* (1959), 219 Md. 627, 150 A. 2d 918.

North Carolina: *Wise* v. *Lodge* (1957), 247 N. C. 250, 100 S. E. 2d 677.

California: In *Musante* v. *Guerrini* (1932), 125 Cal. App. 556, 558, 13 P. 2d 965, the California District Court of Appeal made an important distinction for skidding cases:

'' * * * This is not a case where an automobile comes suddenly and unexpectedly upon a slippery surface [as in the case at bar]. The evidence discloses that the condition which existed at the moment of the skidding had prevailed during the time appellant had traveled at least five or six miles immediately prior thereto.'' Thus our recent decision in *Ventress* v. *Frambes* (1964), 176 Ohio St. 337, is distinguishable from the case at bar.

Likewise the treatise writers stand opposed to the action

taken today. In Blashfield, Automobile Law and Practice (3 Ed.), Section 111.26, the rule is stated thus:

"Ordinarily, one will not be held guilty of negligence in failing to keep to the right of the highway, where that is impossible by reason of circumstances over which he has no control, and for which he is in no sense responsible. Accordingly, where defendant's automobile, through no fault of the driver, skidded on a slippery pavement and was thrown across the center line and collided with plaintiff's automobile, * * * the rule requiring him to keep to the right was held not to apply. * * *"

For a further list of cases which hold that the skidding which was unavoidable under the circumstances furnished a valid excuse for the car's departure from its regular course, see 58 A. L. R. 266, and 113 A. L. R. 1005.

Significantly, the court's opinion leaves much unsaid. Just what is the scope of the negligence per se doctrine as presently refashioned? Is an act of God no longer a valid excuse for the technical violation of a safety statute? Or will the court distinguish between an unexpected single isolated patch of ice (as here) and an unexpected violent wind? What social purpose does it serve to impose such a strict standard, regardless of fault? How can the court limit this new doctrine in the future when it gives no reason for it today?

In the case at bar over 1,300 pages are used in the bill of exceptions. Credibility of witnesses became an important and difficult problem. Twelve minds intently studying a witness are far better equipped to evaluate testimony than is one mind that also is concerned about questions of law.

The Constitution places upon the Court of Appeals the duty to reach final conclusions upon the weight of the evidence. The Court of Appeals in this field of fact determined that there were questions of fact that required the function of a jury. The majority here is substituting its judgment upon questions of fact for the judgment of the Court of Appeals.

The judgment of the Court of Appeals should be affirmed.