JENKINS, APPELLANT, *v.* MORGAN, APPELLEE■

(No. 54305—Decided August 22, 1988.)

*Sheldon D. Schecter,* for appellant.
*John C. Cubar,* for appellee.

DAVID T. MATIA, J. The plaintiff-appellant Eddie Ruth Jenkins appeals from a directed verdict against her at the close of defendant-appellee James T. Morgan's case by the Cuyahoga County Court of Common Pleas in a jury trial. The trial was the consequence of a lawsuit filed by plaintiff against defendant for injuries received by plaintiff when her car and the car driven by defendant collided.

On February 14, 1986, about 4:00 p.m., plaintiff was driving her car north on Warrensville Center Road, near Cedar Road, in South Euclid. In the particular area where plaintiff was driving, Warrensville Center Road has two lanes for northbound traffic and two lanes for southbound traffic. A grass median strip divides the northbound from the southbound lanes.

As plaintiff was driving northbound, in the northbound lane im-

mediately next to the median strip, she was confronted by defendant, who was driving southbound in the northbound lane lawfully occupied by plaintiff. Defendant's wrong-way driving caused a truck travelling immediately in front of plaintiff to swerve left over a curb and into the grass median strip. Plaintiff's car was hit head-on by defendant's car.

On May 16, 1986, plaintiff filed a complaint against defendant for injuries and damages allegedly suffered by plaintiff as a result of the accident. On June 7, 1986, defendant timely filed his answer to the complaint of plaintiff. Defendant denied the allegations contained in plaintiff's complaint and raised as a defense the doctrines of comparative negligence and, interestingly, assumption of the risk.

On July 22, 1987, a jury trial on this matter began which carried over to July 23, 1987.

Plaintiff testified that she saw the truck which was in the same lane and travelling in the same direction as plaintiff pull up on the median strip "* * * and the next minute I saw this car coming straight to me head-on, and I just froze at the steering wheel. I couldn't do nothing [sic]." This testimony is undisputed.

At the trial, it was developed, and is also undisputed, that defendant suffered a massive heart attack while he was driving his car at the time and place of the collision with plaintiff. Defendant testified that as he was travelling southbound on Warrenville Center Road near Cedar, he had "* * * a funny sensation * * *" on the right side of his neck. "* * * The next thing I know I woke up at Hillcrest Hospital in the Emergency Room."

At trial, plaintiff also presented on her behalf the testimony of A. L. Grierson, M.D., by deposition read at the trial. However, the testimony of Dr. Grierson was related to the degree of injury allegedly suffered by plaintiff and is not relevant to this appeal, as demonstrated by this passage from the transcript of Dr. Grierson's deposition:

"[By plaintiff-appellant's counsel:]

"Q. Now, Doctor, turning your attention to March 7th, 1986 did you see the Plaintiff, Eddie Ruth Jenkins, on this date?

"A. Yes.

"Q. Would you tell us the occasion of that first visit?

"A. It was in regard to injuries she sustained in regard to an accident on February 14th, 1986."

Defendant at the trial presented on his behalf the videotaped deposition of Abdalla Ezziddin, M.D. Dr. Ezziddin is a physician in private practice who is licensed to practice medicine in the states of Ohio and California and who is board certified in cardiovascular diseases and internal medicine. The testimony of Dr. Ezziddin was heard by the jury below, and was reviewed by this court, and is highlighted below.

Dr. Ezziddin's first contact with defendant occurred when Dr. Ezziddin examined defendant on February 14, 1986, in the emergency room of Hillcrest Hospital. Defendant had been taken to Hillcrest Hospital by ambulance after the collision between defendant's car and plaintiff's car.

Dr. Ezziddin stated that at the time of the examination defendant was in circulatory shock, a condition characterized by low systolic blood pressure, in this case between sixty and seventy, with a heart rate of between thirty-eight and forty beats per minute.

Dr. Ezziddin testified that an electrocardiogram of defendant at that time showed "evidence of complete heart block" of the defendant's lower two heart chambers, which of the normal heart's four heart chambers are the two responsible for circulating the blood throughout the body.

Dr. Ezziddin testified that the condition of defendant's heart at the time

of the examination "* * * does not support adequate blood flow to the circulation and particularly to the brain * * *." Dr. Ezziddin indicated that the blood pressure of defendant could have been much lower when defendant was sitting up driving a car, as opposed to lying flat, such as the position occupied by defendant during this emergency room examination.

Dr. Ezziddin stated that the condition of "circulatory shock" under which defendant was suffering at the time of the examination could have caused confusion to defendant which may have impaired defendant's ability to operate a motor vehicle.

Ultimately, Dr. Ezziddin's direct testimony offered the following opinion, as questioned by counsel for defendant:

"Q. So, Doctor, I take it it is your opinion within a reasonable degree of medical certainty that as a result of this complete heart block, that in all probability James T. Morgan suffered a loss of consciousness or at a minimum a confused state whereby he would be unable to operate a motor vehicle?

"A. Exactly, And I — the reason I say that is because I asked him specifically, 'What do you remember?' All he remembered that he was sick and that was it."

Dr. Ezziddin was next cross-examined extensively by counsel for plaintiff.

Dr. Ezziddin testified that the defendant's medical history was taken at the emergency room by Dr. Ezziddin from defendant's wife and defendant himself. The defendant told Dr. Ezziddin of the circumstances immediately preceding the accident, as reflected on defendant's discharge summary:

"While he was driving on the evening of this admission, he felt sick, nauseated, and he ended up in a car accident, not knowing the exact circumstances."

Dr. Ezziddin testified that he had no personal knowledge of the period of time which elapsed between defendant's feelings of nausea and the collision with plaintiff.

Next, Dr. Ezziddin testified that defendant was most likely confused at the time of the accident, but Dr. Ezziddin admitted that the time period between defendant's nausea and subsequent confusion is also uncertain.

Moreover, Dr. Ezziddin testified that based on his experience he presumed the period of time between the nausea and confusion was short, but could not conclude this fact definitively.

Dr. Ezziddin stated that most people, using common sense, would stop an automobile which they were driving when such feelings of nausea occurred, and call for help. However, Dr. Ezziddin also stated that a person who may have "common sense" may nevertheless not stop because such a person may be confused as to his current circumstances. The essence of Dr. Ezziddin's testimony on cross-examination is demonstrated in this passage between counsel for plaintiff and Dr. Ezziddin:

"Q. So I'm saying you don't know how long it was from the time he felt the nausea and sickness until the time he got confused and didn't know what was happening. You have no idea how long that took.

"A. I would have to presume it's very brief. Because he could have died and — or if he could —

"Q. I know. But you're only presuming that.

"A. As I said, presumptive.

"Q. Because — you're presuming it because most people will stop and seek help once they get sick, right?

"A. That's provided they are not

confused. If they are confused, they may think everything is normal."

At the close of all the evidence, defendant made a motion for a directed verdict based upon the following:

"The law is quite clear on this issue that even though Mr. Morgan may have been negligent in going left of center, the law of Ohio is that that negligence would be excused if he was stricken by a sudden loss of consciousness, which he could not reasonably foresee and which rendered it impossible for him to control the car."

Plaintiff argued against defendant's motion and claimed that the jury should be allowed to determine "whether or not the man [defendant] had time [to stop his car before the collision and therefore avoid the collision]."

Nevertheless, the court granted the motion:

"THE COURT: Even if he was nauseous, the nauseous [*sic*] could have lasted, and if you interpret the doctor's testimony, the whole thing, assuming he was nauseous, it still wouldn't be inconsistent with the doctor's testimony that said the heart attack preceded the feeling. He said it was something in the neck. The doctor characterized that as being nausea.

"MR. SCHECTER: The doctor said nauseous, and I have to take his word for it.

"THE COURT: Motion is granted. You haven't shown it at all, but this is not a question for a jury. You have the jury speculating. There is no hard evidence whatsoever. The defense evidence was that the thing occurred, the heart attack occurred, within seconds of this."

From this ruling, plaintiff appeals.

Plaintiff as her only assignment of error claims:

"[The] trial court erred in granting defendant's motion for a directed verdict at the conclusion of the defendant's case contrary to the wording and meaning of Rule 50(A)(4) of the Ohio Rules of Civil Procedure, and the evidence at trial."

Civ. R. 50(A)(4) states:

"When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

In considering a motion for a directed verdict, the standard to be followed by the trial court is set forth in *Ruta* v. *Breckenridge-Remy Co.* (1982), 69 Ohio St. 2d 66, 23 O.O. 3d 115, 430 N.E. 2d 935, paragraph one of the syllabus:

"A motion for a directed verdict does not present a question of fact or raise factual issues, but instead presents a question of law, even though in deciding such a motion it is necessary to review and consider the evidence. (Paragraph three of the syllabus in *O'Day* v. *Webb*, 29 Ohio St. 2d 215, and in *Rohde* v. *Farmer*, 23 Ohio St. 2d 82, approved and followed.)"

This standard is explained in *Eldridge* v. *Firestone Tire & Rubber Co.* (1985), 24 Ohio App. 3d 94, 96, 24 OBR 164, 166, 493 N.E. 2d 293, 295:

"* * * The trial court may not weigh the evidence or try the credibility of witnesses, but must give to the party opposing the motion the benefit of all reasonable inferences from the evidence. The 'reasonable minds' test of Civ. R. 50(A)(4) requires the court only to determine whether there is any evidence of substantial probative value in support of the non-moving party's

claim. A motion for a directed verdict raises a question of law because it examines the materiality of the evidence rather than the conclusions to be drawn from the evidence. See *Ruta* v. *Breckenridge-Remy Co.* (1982), 69 Ohio St. 2d 66 [23 O.O. 3d 115]."

At the trial, defendant presented evidence to show that he was driving unlawfully on the wrong side of the road and collided with plaintiff as a result of a massive heart attack which struck defendant while he was driving.

"The burden of proving a legal excuse sufficient to relieve one of the mandatory duty of driving upon the right half of a roadway rests upon the one who has not performed such duty." *Peters* v. *B. & F. Transfer Co.* (1966), 7 Ohio St. 2d 143, 36 O.O. 2d 180, 219 N.E. 2d 27, paragraph three of the syllabus.

The evidence of defendant's relating to his condition consisted of defendant's own testimony, as well as the testimony of Dr. Abdalla Ezziddin, who treated defendant in the Hillcrest Hospital emergency room immediately after the accident.

Plaintiff was able to cross-examine defendant as to the amount of time which elapsed between the onset of symptoms which would indicate to defendant that he was having a heart attack, and his collision with plaintiff.

Plaintiff also extensively cross-examined the defendant's treating physician, Dr. Ezziddin, and this cross-examination was shown by videotape to the court and is discussed in detail by this court, *supra.*

However, plaintiff presented no independent or substantial evidence which may have contradicted the evidence presented by defendant relating to the suddenness of defendant's illness:

"Where the driver of an automobile is suddenly stricken by a period of unconsciousness which he has no rea-

son to anticipate and which renders it impossible for him to control the car he is driving, he is not chargeable with negligence as to such lack of control." *Lehman* v. *Haynam* (1956), 164 Ohio St. 595, 59 O.O. 5, 133 N.E. 2d 97, paragraph two of the syllabus.

Therefore, we uphold the judgment of the trial court directing a verdict in favor of defendant. *Lehman* v. *Haynam, supra.* See, also, *Weldon Tool Co.* v. *Kelley* (1947), 81 Ohio App. 427, 49 Ohio Law Abs. 470, 37 O.O. 253, 76 N.E. 2d 629.

*Judgment affirmed.*

J. V. CORRIGAN, P.J., and STILLMAN, J., concur.

SAUL G. STILLMAN, J., retired, of the Eighth Appellate District, sitting by assignment.