GRAU, APPELLEE, *v.* KLEINSCHMIDT ET AL., APPELLANTS.

[Cite as Grau *v.* Kleinschmidt (1987), 31 Ohio St. 3d 84.]

(No. 86-581—Decided June 24, 1987.)

86

*Francis X. Reddy, Jr.,* for appellee.
*Sheldon D. Schecter* and *David C. Eisler,* for appellants.

WRIGHT, J. This appeal presents two issues. First, the proper standard to be applied when a directed verdict is sought by the defendant in a libel action brought by a public official and second, whether the court of appeals erroneously overturned the directed verdict issued by the trial court.

## I

We begin our analysis with a brief examination of the standard which applies to the underlying defamation proceeding. In *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, the high court set forth a standard which "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was

false or with reckless disregard of whether it was false or not.'"[7] *Id.* at 279-280.

In subsequent decisions, the Supreme Court has emphasized that public officials may only recover damages for libel upon clear and convincing proof of actual malice, *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323, 342; *Buckley* v. *Littell* (C.A. 2, 1976), 539 F. 2d 882, certiorari denied (1977), 429 U.S. 1062, with the focus being upon the defendant's attitude pertaining to the truth or falsity of the published statements, rather than any hatefulness or ill-will. See *Herbert* v. *Lando* (1979), 441 U.S. 153; *Cantrell* v. *Forest City Publishing Co.* (1974), 419 U.S. 245. Accordingly, the plaintiff bears the burden of demonstrating with convincing clarity that the publication of false statements was made with knowledge of their falsity, or with a "high degree of awareness of their probable falsity," *Garrison* v. *Louisiana* (1964), 379 U.S. 64, 74, or "that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 731. In determining whether a plaintiff has met this burden, it is important to consider the totality of the circumstances which led to the publication of the statements. See *Scott* v. *News-Herald* (1986), 25 Ohio St. 3d 243, 25 OBR 302, 496 N.E. 2d 699, _____ A.L.R. 4th _____.

Recently, the Supreme Court has amplified its position previously set forth in *New York Times Co.* that, on appeal, libel cases involving public officials require heightened judicial scrutiny. Thus, in *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984), 466 U.S. 485, rehearing denied (1984), 467 U.S. 1267, the court reasoned that "[a]ppellate judges in such a case must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity." *Id.* at 514. This independent review of the record aids in protecting against " 'forbidden intrusion[s] * * * [into] the field of free expression' " and "assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge." *Id.* at 508 and 501.

## II

Our review of this controversy must include an examination of Civ. R. 50(A)(4) which provides:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court

---

[7] All parties to the within appeal concede that for purposes of a libel action appellee is a public figure.

shall sustain the motion and direct a verdict for the moving party as to that issue."

A motion for a directed verdict presents a question of law, not a question of fact, "even though in deciding such a motion it is necessary to review and consider the evidence." *Ruta* v. *Breckenridge-Remy Co.* (1982), 69 Ohio St. 2d 66, 23 O.O. 3d 115, 430 N.E. 2d 935, paragraph one of the syllabus. Where there is sufficient evidence relating to an essential issue which permits reasonable minds to reach different conclusions, then it is incumbent upon the trial court to submit the issue to the factfinder for consideration. See, *e.g., Wever* v. *Hicks* (1967), 11 Ohio St. 2d 230, 40 O.O. 2d 203, 228 N.E. 2d 315. However, "it is also the duty of a trial court to withhold an essential issue from the jury when there *is not* sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue. In other words, if all the evidence relating to an essential issue is sufficient to permit only a conclusion by reasonable minds against a party, after construing the evidence most favorably to that party, it is the duty of the trial court to instruct a finding or direct a verdict on that issue against that party. Naturally, if the finding on that one issue disposes of the whole case, a duty arises to grant judgment upon the whole case." *O'Day* v. *Webb* (1972), 29 Ohio St. 2d 215, 220, 58 O.O. 2d 424, 427, 280 N.E. 2d 896, 899-900, citing *Peters* v. *B. & F. Transfer Co.* (1966), 7 Ohio St. 2d 143, 36 O.O. 2d 180, 219 N.E. 2d 27; *Hamden Lodge* v. *Ohio Fuel Gas Co.* (1934), 127 Ohio St. 469, 189 N.E. 246; *Helms* v. *American Legion, Inc.* (1966), 5 Ohio St. 2d 60, 34 O.O. 2d 124, 213 N.E. 2d 734; *Archer* v. *Port Clinton* (1966), 6 Ohio St. 2d 74, 35 O.O. 2d 88, 215 N.E. 2d 707.

Just as summary judgment procedures "are especially appropriate in the First Amendment area," *Dupler* v. *Mansfield Journal* (1980), 64 Ohio St. 2d 116, 120, 18 O.O. 3d 354, 357, 413 N.E. 2d 1187, 1191, so too are directed verdicts. The distinctions between summary judgment procedures and directed verdicts[8] were recently addressed by Justice White in *Ander-*

---

[8] The differences between the Ohio and Federal Rules of Civil Procedure in this area are minimal. Under Fed. R. Civ. P. 50(a), "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Brady* v. *Southern R. Co.* 320 US 476, 479-480, * * * (1943). If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed. *Wilkerson* v. *McCarthy,* 336 U.S. 53, 62 * * * (1949)." *Anderson* v. *Liberty Lobby, Inc., infra* (91 L. Ed. 2d), at 213.

The issuance of a motion for summary judgment under Fed. R. Civ. P. 56(c) is governed by language providing that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In similar fashion, Ohio Civ. R. 50(A)(4) and 56(C) respectively provide:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is

*son* v. *Liberty Lobby, Inc.* (1986), 477 U.S. ____, 91 L. Ed. 2d 202, 214, wherein it was stated:

"[T]he 'genuine issue' summary judgment standard is 'very close' to the 'reasonable jury' directed verdict standard: 'The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted.' * * * In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

In view of the similarities between a summary judgment motion and a motion for a directed verdict, we are persuaded that the underlying test in *Dupler* v. *Mansfield Journal* (wherein we concluded that the convincing clarity standard for actual malice was applicable in summary judgment procedures) should similarly apply to directed verdicts.[9] Accordingly, when a trial court rules upon a defendant's motion for a directed verdict in a libel action brought by a public official, the court shall construe the evidence most strongly in favor of the party against whom the motion is directed in order to determine whether a reasonable jury could find from a totality of the circumstances the existence of actual malice with convincing clarity. If the trial court in ruling upon a defendant's motion for a directed verdict in a libel action brought by a public official finds from a totality of the circumstances that reasonable minds could only conclude that the plaintiff's evidence fails to demonstrate actual malice with convincing clarity, then the court shall sustain the motion and direct a verdict thereby entering judgment for the defendant.

---

directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

"* * * Summary judgment shall be rendered forthwith if the pleading, depositions, answers to the interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * *"

[9] In applying the convincing clarity standard to summary judgment proceedings in *Dupler,* we stated in paragraphs one and two of the syllabus as follows:

"In ruling upon defendant's motion for summary judgment in a libel action brought by a public official, the court shall consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff to determine whether a reasonable jury could find actual malice with convincing clarity.

"In considering defendant's motion for summary judgment in a libel action brought by a public official, if the court finds that there is no genuine issue of material fact from which a reasonable jury could find actual malice with convincing clarity, it must enter judgment for defendant."

## III

Application of the foregoing principles to the evidence presented by appellee at trial militates the conclusion that, as a matter of law, the evidence did not demonstrate actual malice with convincing clarity as defined in the *New York Times Co.* case. As was recognized in that case, and in *St. Amant* v. *Thompson, supra,* and *Associated Press* v. *Walker* (1967), 388 U.S. 130, the failure to investigate the truth or falsity of a statement prior to its publication is insufficient to demonstrate actual malice. Further, negligence or the failure to act in a reasonably prudent manner is likewise insufficient to show actual malice. Instead, what is required is that the totality of the circumstances demonstrate with convincing clarity that the false statements were published with prior knowledge of their falsity or with "serious doubts" as to their truth or a "high degree of awareness" of probable falsity. *Garrison* v. *Louisiana, supra; St. Amant* v. *Thompson, supra; Scott* v. *News-Herald, supra.*

A thorough review of the record reveals that appellee failed to demonstrate with convincing clarity that appellant published the "letters to the editor" or the Stachewicz news release with knowledge of their falsity or with reckless disregard for the truth or falsity of the publications. When Bowler brought his letter to the Leader on August 17, 1981, appellant, after reviewing its contents, requested that Bowler verify certain facts contained therein. Specifically, appellant was concerned about Bowler's assertion that the check from Cox Cable was drawn in favor of Grau. Bowler then left appellant's office and proceeded to city hall to further verify his facts. Later that afternoon, appellant received a telephone call from Mayor Holtz. At the time of this call, Bowler was in the mayor's office. Holtz indicated to appellant that the letter was entirely factual, and even went so far as to volunteer to have his secretary retype the letter.[10] It was at this point that appellant believed Grau was in possession of a $100,000 check from Cox Cable drawn in Grau's name. Specifically, Kleinschmidt testified that he became convinced of this allegation in view of having spoken with Holtz, the incumbent mayor and "Grau's boss," as well as having spoken with Bowler, a former mayor of Garfield Heights and a person, who the record reflects, had an outstanding reputation in the community for truth and veracity. In other words, Kleinschmidt had two mayors, one past and one present, with excellent reputations for honesty within the community, indicating that the cable franchise check was drawn in Grau's name.

Following the publication of the Bowler letter, Grau contacted appellants to inform them that the check was drafted in favor of the city and not in his name. Kleinschmidt assured Grau that the comments contained within the Bowler letter would be remedied. Although he made this

---

[10] Upon its initial presentation to appellant, Bowler's letter was typewritten with handwritten notations.

assurance, the record demonstrates Kleinschmidt was confused[11] and continued to give credence to Bowler's initial statements and Holtz's erroneous confirmation of those statements. Nevertheless, in the August 27, 1981 edition of the Leader, Kleinschmidt published in his "Radar" column a clarification stating that "the $100,000 check sent to Garfield Hts. by Cox Cable was NOT in Paul Grau's name * * *." The record demonstrates unequivocally that the "Radar" column enjoys more readership than virtually any other portion of the Leader, and that appellants were affording their readers the opportunity to be aware that the Cox Cable check may not have been drafted in Grau's name.

Also appearing in the August 27, 1981 edition of the Leader were the hereinbefore mentioned items by Stachewicz. The front page item entitled "Administration Creates 'Cablegate' '" was, in large part, a campaign news release from Stachewicz' office. The remaining item was a letter to the editor, also authored by Stachewicz. The record demonstrates that in spite of the clarification appearing in the "Radar" column, Kleinschmidt continued to place great reliance upon the Bowler letter, as confirmed by Holtz, and that at no time did he harbor any serious doubts about its accuracy, having conversed with the current mayor of Garfield Heights.

The Supreme Court has conceded that for better or worse the definition of actual malice in the context of a libel suit places "a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity." *St. Amant* v. *Thompson, supra,* at 731.

Measuring the claimed actual malice "at the time of publication," *New York Times Co., supra,* at 286, and being mindful that the articles must be examined in view of the totality of the circumstances which led to their publication, *Scott, supra,* we are inclined to agree with the trial court that

---

[11] "Q. Well, were you pretty much satisfied when you received the call from Mr. Grau that he didn't have the $100,000 check?

"Were you pretty much satisfied that that was the case?

"A. At that time, no. I was confused because I had two public officials, like I said before, Mayor Holtz, Mr. Grau's employer, and former Mayor Neil Bowler, who has a very good reputation within the City. At that time I was confused. Two people said no, this one said yes. So I felt as far as I am going, I will give them the fair play.

"I didn't see any check. I did not know. So I gave them both, to be fair, I gave Mr. Grau this because he said, hey, it isn't, but Mr. Holtz, who was the Mayor at the time, Mr. Grau's employer, and Mr. Bowler, the former Mayor, said there was. So I was confused. I said, well, Mr. Grau says this. So I gave them both equal ink, equal space, to be fair.

"Q. Your answer to my question then, if I have it right, was that even after you received the call from Grau saying he didn't have the check, there was still a doubt in your mind, right?

"A. I was confused. There was no serious doubt in my mind. I was confused. I had too many people say too many different things.

"Q. What does confused mean?

"A. Confused means not really knowing but not seriously."

the evidence demonstrates at most "a rather shoddy practice" of journalism. The court of appeals did not have the benefit of the totality of the circumstances standard set forth by Justice Locher in *Scott*. The standard enunciated therein, coupled with the fact that malice must be demonstrated with convincing clarity, negate appellee's case. Contrary to the position espoused by the court below, we can not and will not hold that a directed verdict will only be granted where libel is not demonstrated in the first place. The fatal flaw contained within appellee's argument is that appellant's failure to personally seek to view the check held by Grau somehow rises to a reckless disregard of whether the Bowler and Stachewicz letters were false or not. Appellee's argument would possess merit, but for the fact that appellant *did* investigate the truthfulness of the Bowler allegation with Grau's uppermost supervisor and, based upon this investigation, he obtained information negating any high degree of awareness of the probable falsity of the allegations.[12]

Appellee also suggests that the "letters to the editor" published by appellant demonstrate a disdain for factual and accurate reporting. As was stated in *Moriarity* v. *Lippe* (1972), 162 Conn. 371, 294 A. 2d 326:

"A 'letters to the editor' column provides an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities but who wish to exercise their freedom of speech even though they are not members of the press. The * * * [newspaper] did not fabricate the letter; it was not the product of its publisher's imagination; it was not based on an unverified anonymous communciation. The contents of the letter were not so inherently improbable that only a reckless man would have put them into circulation." *Id.* at 381, 294 A. 2d at 332, citing *St. Amant* v. *Thompson, supra.*

To the sound reasoning expressed by the court in *Moriarity,* we would add that the letters and publication in the instant case surfaced during a decision-making process of great significance within Garfield Heights and during a period of time when the mayoral race was taking shape. The purpose behind the standard set forth in *New York Times Co.* and its progeny is to maintain a free press when debate arises on public issues or the conduct of public officials, and to avert self-censorship from the fear of being the target of a defamation proceeding with each and every publication. A free and vigorous press must be maintained even at a high cost. The very nature of daily reporting of a political campaign or of volatile public issues negates the likelihood that the coverage will always be free from inaccuracy or even bias and, thus, error becomes the unfortunate by-product of virtually every political dispute. In spite of the inevitable errors which

---

[12] Our judgment might be otherwise had appellant not sought to verify Bowler's remarks with Grau's uppermost supervisor and then, in spite of Grau's telephone conversation, caused the publication of the Stachewicz comments on August 27, 1981, or, if appellant had personally viewed the Cox Cable check prior to the August 27 publications.

are likely to surface, the media performs a necessary and vital function within the political process. Accordingly, imposition of a standard less rigorous than that imposed under *New York Times Co.* would encourage more inhibited and less robust coverage of public issues. *Associated Press* v. *Walker, supra.* Absent a clear and convincing demonstration that a member of the media has undertaken the role of a malicious advocate, courts must not, in effect, allow punishment of the messenger.

In view of the totality of the circumstances outlined above and the facts appearing in the record, we are unable to agree with the court of appeals that appellee's evidence was convincingly clear so as to enable a reasonable jury to reach different conclusions on the issue of whether appellants either knew that the publications were false or printed with reckless disregard of their falsity.

For the foregoing reasons, the judgment of the court of appeals is reversed and the trial court's judgment is hereby reinstated.

*Judgment reversed.*

MOYER, C.J., LOCHER, DOUGLAS and H. BROWN, JJ., concur.

PATTON and HOLMES, JJ., dissent.

PATTON, J., of the Eighth Appellate District, sitting for SWEENEY, J.

DOUGLAS, J., concurring. As detailed more fully in the recitation of facts in the majority opinion, this case involves publications which occurred during the course of reporting a political campaign — a race for the office of Mayor of Garfield Heights. While I agree with the language of the majority opinion regarding the standards applicable generally to a motion for a directed verdict, I write separately to express my concerns which, to me, emanate from the first paragraph of the syllabus of the opinion and from some of the language contained therein.

It seems clear to me that today we have made yet another concession to libel by using the terms "reasonable jury," "totality of the circumstances," "existence of actual malice," and, especially, "convincing clarity." With the use of such terms, we make each libel case brought by a public official or public person potentially a jury question or, at the least, a call by a judge or a panel of judges to determine whether information regarding public figures and their public-related activities should have been printed.

I suspect that most of us could agree on what is a "reasonable jury." It is, of course, one that finds in our favor or in accordance with the way in which we think a given case should have been resolved. Conversely, is any jury that finds contra these positions an "unreasonable jury?" By today's test we must now determine in each libel case what a "reasonable jury" might conclude. Who decides this question? Why judges — of course!

Likewise do I find, in public-figure libel cases, difficulty with a test of "totality of the circumstances." Again, circumstances that may be important to one judge to include in the "totality" may not be so important to another judge called upon to decide a particular libel case. This difficulty is magnified when such terms are applied to find the "existence of actual malice." "Malice" is a malleable, supple, abstract, elusive, hard to prove or disprove concept. To say that all of this now must be determined by a standard of "convincing clarity," an obviously subjective standard easily open to differing judgments, in deciding a defendant's motion for a directed verdict in a libel action brought by a public official, invites, in my judgment, each such libel action to proceed at least to the directed verdict stage in the judicial process.

To accept such a proposition is to clothe ourselves with the authority to make such decisions and thereby concedes that there is some right to censor such publications. The very act of saying that we will decide if some specific public comment about a public figure concerning public activity should or should not have been printed is already an act of censorship. As has often been quoted, democracy calls for robust, wide-open debate about public issues. What we add, even unintentionally, to the field of libel, we subtract from the arena of debate. Such decisions as to what, when and how to publish are better left to editors — not judges. It would be better for us to just accept, rather than to continually try to explain, the First Amendment to the United States Constitution (as made applicable to the states by the Fourteenth Amendment) which states, in pertinent part, that there should be no law made "* * * abridging the freedom of speech, or of the press * * *." Censorship is contagious — and can become habit-forming.

What the case before us involves, and what I have hereinbefore said, concerns alleged defamatory statements about public figures involved with public business. Of course, the Constitution does not protect defamatory statements directed against the private conduct of a public official or a private citizen. Such defamation has nothing to do with the political consequences of a self-governing society. Liability assessed for defamation concerning private matters does not abridge the First Amendment freedoms of speech or press and thus must be judged by a different standard. That, however, is clearly not what we have here.

The alleged defamation complained of in the case before us took place in the course of reporting a political campaign. Much of the publishing about which appellee complains was the reporting and quoting from a press release of a party interested in the election. We need no extensive voyage through the law of libel — *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254, and its progeny — to decide this case. Can there really be any question that such reporting is protected by the First Amendment as a matter of law? Is it not cases like this that should be dismissed on the pleadings or, at the latest, on summary judgment, in order to protect against the "chilling effect" to which we give so much lip service?

Compare what was reported by the Garfield Heights Leader in this case with that which was said about some of our historical political figures as set forth in *Desert Sun Pub. Co.* v. *Superior Ct.* (1979), 97 Cal. App. 3d 49, 51, 158 Cal. Rptr. 519, 520-521:

"In *New York Times Co.* v. *Sullivan,* 376 U.S. 254 at page 270 [11 L. Ed. 2d 686 at page 701, 84 S. Ct. 710, 95 A.L.R. 2d 1412], the Supreme Court observed that this country has 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'

"This 'profound national commitment' encompasses the constitutionally protected right not only to make responsible, but also to make irresponsible charges against those in or seeking public office. It is an essential part of our national heritage that an irresponsible slob can stand on a street corner and, with impunity, heap invective on all of us in public office. At such times the line between liberty and license blurs. However, our dedication to basic principles of liberty and freedom of expression will tolerate nothing less. The alternative is censorship and tyranny.

"Our political history reeks of unfair, intemperate, scurrilous and irresponsible charges against those in or seeking public office. Washington was called a murderer, Jefferson a blackguard, a knave and insane (Mad Tom), Henry Clay a pimp, Andrew Jackson a murderer and an adulterer, and Andrew Johnson and Ulysses Grant drunkards. Lincoln was called a half-witted usurper, a baboon, a gorilla, a ghoul. Theodore Roosevelt was castigated as a traitor to his class, and Franklin Delano Roosevelt as a traitor to his country. Dwight D. Eisenhower was charged with being a conscious agent of the Communist Conspiracy."

By comparison, what the Garfield Heights Leader published in this case pales into insignificance. Each of us in public life has found, on occasion, the press to be arrogant, tyrannical, abusive and sensationalist, just as we have found it to be incisive, probing and informative. Whatever we have found it to be in the past, to the degree that we value our freedom and our right to know, we must ensure that the press remains free.

Accordingly, I concur in the judgment of the majority.

HOLMES, J., dissenting. The majority, in its syllabus law, sets forth valid standards to be followed by the trial court in ruling upon a motion by a defendant for a directed verdict in a libel action brought by a public official. However, the syllabus law fails to set forth other established law to be applied by this court in the review of appellate court determinations of libel matters. The body of the opinion, however, correctly points out that appellate judges must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity, and that this independent review assigns to the appellate judge a responsibility that cannot be delegated to the trier of the fact, citing *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984), 466 U.S. 485. This the court of appeals

did after a thorough review of the record and, applying the appropriate test, found that the trial court had improperly granted defendants' motion for directed verdict. This court should not reverse that court unless its judgment is contrary to law.

Concerning the applicable law, I agree with the majority that the mere failure to investigate the truth or falsity of a statement prior to its publication may not be sufficient to demonstrate actual malice with convincing clarity. I also agree that simple negligence or the failure to act in a reasonably prudent manner should not be the standard of conduct to prove actual malice. It should be noted as to this point that I dissented from the opinion of this court in *Embers Supper Club, Inc.* v. *Scripps-Howard Broadcasting Co.* (1984), 9 Ohio St. 3d 22, 9 OBR 115, 457 N.E. 2d 1164. The standard that should be applied in determining actual malice is whether the totality of the circumstances demonstrates with convincing clarity that the false statements were published with prior knowledge of their falsity, or with serious doubts as to their truth, or with a reckless disregard as to their truthfulness.

As to the facts to which the law must be applied here, Kleinschmidt, in testifying as to why he proceeded to publish an agreed false statement of fact, stated that he did so because he was "confused" and that he "had too many people say too many different things" about the circumstance of the plaintiff holding the check, so he gave both expressions "equal ink." The facts show that he had actually placed the libelous material on the front page as news and in a letter to the editor, while relegating the negating comments to the editor's gossip column — hardly "equal ink." These facts present significant evidence in support of a reckless disregard as to the truthfulness of the complained-of published material.

The court of appeals correctly found that the trial court had incorrectly compared the facts of this case with those in *Dupler* v. *Mansfield Journal* (1980), 64 Ohio St. 2d 116, 18 O.O. 3d 354, 413 N.E. 2d 1187, wherein the court had appropriately found that an editor's incorrect interpretation of the statute, and statements of a public official's violation of the law could not present a jury issue of malice with convincing clarity. The court of appeals found here that the state of the evidence in regard to Kleinschmidt's knowledge of the falsity of the material concerning Grau, or his reckless disregard of its falsity, is not comparable to the undemonstrated malice in *Dupler*. I agree.

Counsel for Grau elicited evidence to show that Kleinschmidt printed the letter from Bowler and amplified its implications concerning Grau without verifying them with the plaintiff; that Grau informed Kleinschmidt of his error and received Kleinschmidt's assurance that it would be rectified; that, while acknowledging his misstatement of fact in a page two gossip column, Kleinschmidt reprinted the same allegations concerning Grau's purported improper acts on page one and in a letter to the editor.

A reasonable jury could rationally conclude from the retraction itself that Kleinschmidt either knew that the charges were false or "entertained serious doubts as to the truth of his publication." *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 731. On these facts, a jury could find more than just "a rather shoddy practice" of journalism; a jury could reasonably find actual malice with convincing clarity. The majority, under the facts presented to us here, permits a standard of reporting which is not merely "shoddy," but one that under the guise of freedom of the press would protect those who act without any concern for the resultant effect of their false publications. This policy is neither needed nor would it be condoned by the public or the journalism profession. The trial court improperly granted defendants' motion for directed verdict.

Accordingly, I would affirm the judgment of the court of appeals.

PATTON, J., concurs in the foregoing dissenting opinion.