[Cite as *Hewitt v. L.E. Myers Co.*, 2011-Ohio-5413.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 96138

---

## LARRY HEWITT

### PLAINTIFF-APPELLEE

vs.

## THE L.E. MYERS CO., ET AL.

### DEFENDANTS-APPELLANTS

---

### JUDGMENT:
### AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-711717

**BEFORE:** Kilbane, A.J., Blackmon, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** October 20, 2011

**ATTORNEYS FOR APPELLANT**

Benjamin C. Sassé
Mark F. McCarthy
Tucker Ellis & West L.L.P.
1150 Huntington Building
925 Euclid Avenue
Cleveland, Ohio 44115

**ATTORNEYS FOR APPELLEES**

**For Larry Hewitt**

Frank Gallucci III
David E. Gray II
Michael D. Schroge
Plevin & Gallucci Co., L.P.A.
55 Public Square - Suite 2222
Cleveland, Ohio 44113

Paul W. Flowers
Paul W. Flowers Co., L.P.A.
Terminal Tower - 35th Floor
50 Public Square
Cleveland, Ohio 44113

**For Bureau of Workers' Compensation
and Ohio Attorney General**

Adam J. Bennett
Andrew Cooke & Associates, L.L.C.
243 North Fifth Street - Third Floor
Columbus, Ohio 43215

MARY EILEEN KILBANE, A.J.:

{¶ 1} Defendant-appellant, The L.E. Myers Co. (L.E. Myers), appeals from the trial court's judgment denying its motion for directed verdict and motion for judgment notwithstanding the verdict. Finding no merit to the appeal, we affirm.

{¶ 2} The instant appeal arises from a workplace intentional tort action filed by Larry Hewitt (Hewitt) against L.E. Myers; the Administrator, Bureau of Workers' Compensation (BWC); and the former Ohio Attorney General, Richard Cordray (OAG).[1] Hewitt filed his complaint in December 2009, and was granted leave to amend on April 14, 2010.[2]

{¶ 3} The amended complaint alleges that in June 2006, Hewitt, a second-step apprentice lineman for L.E. Myers, was electrically shocked after he was instructed by his supervisor to work alone in an elevated lift machine (bucket) with energized high-voltage power equipment and without wearing his protective safety equipment. He alleges his superiors told him that he did not have to wear his protective rubber gloves and sleeves while replacing the high-voltage electrical line with a new line. Hewitt claims that unbeknownst to him, the lines were not all de-energized and he inadvertently contacted an energized wire. Hewitt alleges L.E. Myers knew with a substantial certainty that he

---

[1]The BWC was included in the lawsuit as a result of subrogation rights it asserted and the OAG was included because of constitutional issues relating to R.C. 2721.12.

[2]Hewitt previously filed his workplace intentional tort claim against L.E. Myers in June 2008, but then dismissed the case without prejudice in December 2008.

would be injured when working alone in an elevated lift machine with live high-voltage power transmission equipment and without proper safety equipment or training. Hewitt claims that as a result of this incident, he sustained multiple and permanent injuries, emotional distress, pain and suffering, and other damages.[3]

{¶ 4} L.E. Myers moved to dismiss the first amended complaint, or in the alternative, leave to file a motion for summary judgment. The trial court denied the motion to dismiss and leave to file a motion for summary judgment. L.E. Myers asked the trial court to reconsider the denial of its motion for leave to file for summary judgment. The trial court granted L.E. Myers' request and L.E. Myers filed its motion for summary judgment in July 2010. However, L.E. Myers' motion for summary judgment was subsequently stricken from the record for failing to comply with the court's discovery orders. The matter proceeded to a jury trial, at which the following evidence was adduced.

{¶ 5} In early 2005, Hewitt enrolled in the American Line Builders Apprenticeship Training Program (ALBAT). When he completed this program, Hewitt became certified as an apprentice and began working with L.E. Myers. L.E. Myers hired Hewitt, through a local union, to assist with the installation of new electrical wires along Route 60 in New London, Ohio.

---

[3]In Count 2, which has not been appealed, Hewitt sought a declaration that R.C. 2745.01 is unconstitutional.

**{¶ 6}** At the time of the incident, Hewitt was a second-step apprentice, which meant that he was in the early stages of his apprenticeship. At the second step, a person learns the trade and how to climb utility poles under a journeyman lineman's supervision. A second-step apprentice is not certified to work around any voltage greater than 500 volts. There are seven steps in the ALBAT program before an apprentice completes the apprenticeship program and becomes a lineman.

**{¶ 7}** On June 14, 2006, Hewitt reported to the New London worksite with his coworkers. Journeyman lineman Dennis Law (Law) supervised Hewitt that day and informed Hewitt that he would be replacing the wiring on the poles alone in the bucket above, while Law directed traffic below. Law testified the crew was short-staffed, so he was instructed to direct traffic in addition to supervising Hewitt. Law asked Hewitt if he had a problem working alone in the bucket. Hewitt was nervous and replied, "yeah, I never been up by myself." Law told him that he "would be okay." Hewitt testified Law then told him that he "shouldn't need no rubbers [protective gloves] going up to work on the line" because he would not be working with energized wires. Thus, Hewitt believed that he was not going to be working with any energized lines that day.

**{¶ 8}** Hewitt maneuvered his bucket near the wires and removed the neutral wire wearing his leather gloves. Law was flagging traffic while simultaneously attempting to supervise Hewitt alone in the bucket 35 feet above. He yelled "hey" to Hewitt, which caused Hewitt to look over his shoulder. Law intended to tell Hewitt to put on his rubber gloves. As Hewitt looked back, the tie wire he held in his right hand touched an

energized wire, causing him to be electrically shocked. Hewitt then maneuvered himself to the ground. He tried to pull up his sleeve, but his shirt was stuck to his arm. Hewitt testified that his arm looked like a burnt cigarette. Hewitt's burns cover his entire arm, underneath his underarm, around his shoulder, and onto his back.

{¶ 9} Foreman Julian Cromity (Cromity) testified that on that morning he had a discussion with crew foreman Steve Dowdy (Dowdy) that it would be good experience for the apprentices to clip in the wire without wearing their rubber gloves and sleeves because it was hot that day and the primary line was de-energized. However, Law testified that he told Hewitt to wear rubber gloves and sleeves and Dowdy told everyone to wear rubber gloves and sleeves. L.E. Myers District Superintendent Jack Ehle investigated the incident. Following his investigation, L.E. Myers terminated three employees: Law, Dowdy, and foreman Jeff Erman (Erman).

{¶ 10} Hewitt filed a workers' compensation claim that was allowed for a number of conditions, including secondary burns to the right: forearm, axilla, thumb, and wrist, third degree burns to the right hand and arm, right median nerve injury, major depression, moderate posttraumatic stress disorder, and Reflex Sympathetic Dystrophy (RSD) of the right upper limb.

{¶ 11} At the conclusion of Hewitt's case, L.E. Myers moved for directed verdict, raising four issues. L.E. Myers argued it was entitled to judgment as a matter of law with respect to: (1) liability under R.C. 2745.01; (2) future injury; (3) past non-economic damages; and (4) punitive damages. The trial court denied L.E. Myers' motion with

respect to future injury, past non-economic damages, and punitive damages. However, the trial court found that Hewitt failed to prove his case with respect to R.C. 2745.01(A) and (B). As a result, this limited Hewitt's theory of recovery to R.C. 2745.01(C). L.E. Myers did not present any witnesses, and its renewed motion for directed verdict was denied by the trial court. The jury returned a verdict in Hewitt's favor, awarding him $597,785 in compensatory damages. L.E. Myers then moved for judgment notwithstanding the verdict (JNOV), which the trial court denied.

{¶ 12} L.E. Myers now appeals, raising the following two assignments of error for review.

ASSIGNMENT OF ERROR ONE

**"The trial court erred in denying [L.E. Myers'] motion for directed verdict and JNOV."**

ASSIGNMENT OF ERROR TWO

**"In the alternative, L.E. Myers was entitled to partial JNOV on Hewitt's claim for future damages."**

Standard of Review

{¶ 13} We employ a de novo standard of review when reviewing a motion for directed verdict and a JNOV because these motions present questions of law and not factual issues. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 1995-Ohio-214, 652 N.E.2d 684; *Grau v. Kleinschmidt* (1987), 31 Ohio St.3d 84, 90, 509 N.E.2d 399.

Directed Verdict and Judgment Notwithstanding the Verdict

**{¶ 14}** Civ.R. 50 sets forth the standard for granting a motion for a directed verdict

and a motion for JNOV:

> **"When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to each party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.   Id. at (A)(4).[4]**

> **"Whether or not a motion to direct a verdict has been made or overruled * * * a party may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion; or if a verdict was not returned, such party, * * * may move for judgment in accordance with his motion.   A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative."   Id. at (B).**

**{¶ 15}** In *Posin v. A.B.C. Motor Court Hotel*, *Inc.* (1976), 45 Ohio St.2d 271, 275,

344 N.E.2d 334, the Ohio Supreme Court stated:

> **"The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict.   The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied.   Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions. *McNees v. Cincinnati Street Ry. Co.* (1949), 152 Ohio St. 269, 89 N.E.2d 138; *Ayers***

---

[4]"The 'reasonable minds' test of Civ.R. 50(A)(4) calls upon the court only to determine whether there exists any evidence of substantial probative value in support of that party's claim."   *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 69, 430 N.E.2d 935, citing *Hamden Lodge v. Ohio Fuel Gas Co.* (1934), 127 Ohio St. 469, 189 N.E. 246.

*v. Woodard* (1957), 166 Ohio St. 138, 140 N.E.2d 401; Civ.R. 50(A) and (B)."

<u>Employer Intentional Tort Statute</u>

**{¶ 16}** R.C. 2745.01, the employer intentional tort statute, provides in pertinent part:

**"(A) In an action brought against an employer by an employee * * * for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.**

**"(B) As used in this section, 'substantially certain' means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.**

**"(C) Deliberate removal by an employer of an equipment safety guard or deliberate misrepresentation of a toxic or hazardous substance creates a rebuttable presumption that the removal or misrepresentation was committed with intent to injure another if an injury or an occupational disease or condition occurs as a direct result."**

**{¶ 17}** L.E. Myers states that "[t]he sole liability issue in this appeal is whether Hewitt presented sufficient evidence to trigger the rebuttable presumption of intent to injure associated with the '[d]eliberate removal by an employer of an equipment safety guard' where 'an injury * * * occurs as a direct result.'" However, L.E. Myers had the opportunity to present evidence to rebut this presumption, but instead rested its case without presenting any witnesses.

{¶ 18} L.E. Myers argues the trial court erred when it found that R.C. 2745.01(C) "'doesn't mean' that L.E. Myers is entitled to judgment as a matter of law where 'people in a supervisory capacity' instructed Hewitt 'that the use of rubber gloves and sleeves was not necessary * * * on that morning."  L.E. Myers claims that the trial court's construction is inconsistent with the plain text of the statute.  L.E. Myers contends the phrase "equipment safety guard" applies to items that not only have as their object the safety of the employee, but are also a part of a piece of equipment.  As a result, it claims that R.C. 2745.01(C) is limited to cases involving the deliberate removal of a safety guard from equipment.

{¶ 19} L.E. Myers further claims that its interpretation of R.C. 2745.01(C) is supported by the Ohio Supreme Court's ruling in *Fyffe v. Jeno's Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108.  In *Fyffe*, the court interpreted similar language in former employer intentional tort statute, R.C. 4121.80(G)(1), which provided that: "'[d]eliberate removal by the employer of an equipment safety guard * * * is evidence, the presumption of which may be rebutted, of an act committed with the intent to injure another * * *."  Id. at 119.[5]  The *Fyffe* court stated that the "deliberate removal by the employer of an equipment safety guard" means "that the employer has deliberately removed a safety guard from equipment which employees are required to operate[.]"  Id.

---

[5]R.C. 4121.80 was declared unconstitutional by the Ohio Supreme Court in *Brady v. Safety-Kleen Corp.* (1991), 61 Ohio St.3d 624, 576 N.E.2d 722.

**{¶ 20}** We note that the General Assembly has not provided a definition of "equipment safety guard" or "deliberate removal" for the purposes of R.C. 2745.01(C). L.E. Myers would have us construe R.C. 2745.01(C) in a way that limits recovery to situations only where employees are injured while working with equipment, such as a machine or press. We decline to do so.

**{¶ 21}** Had the General Assembly envisioned that the presumption would be limited to injuries attributable to a "safety guard" that should have been attached to machinery "which employees are required to operate," then such terms would have been included in R.C. 2745.01(C). A reading reveals that these terms are absent from the statute. If we accept L.E. Myers' interpretation, then employees who, by the very nature of their profession, work with equipment other than a machine or press would be barred from recovery under R.C. 2745.01(C). Hewitt points out this court's recent decision in *Houdek v. ThyssenKrupp Materials N.A., Inc.*, Cuyahoga App. No. 95399, 2011-Ohio-1694, where we stated that the "employer tort has not been abolished, but rather constrained. Whether an employer tort occurs in the workplace depends on the facts and circumstances of each case." Id. ¶11. For the following reasons, we find that there was substantial evidence that L.E. Myers deliberately removed an equipment safety guard.

**{¶ 22}** When interpreting a statute, "a court's paramount concern is the legislative intent in enacting the statute. In determining legislative intent, the court first looks to the language in the statute and the purpose to be accomplished. Words used in a statute must

be taken in their usual, normal, or customary meaning. It is the duty of the court to give effect to the words used and not to insert words not used. Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need to apply rules of statutory interpretation." (Internal citations and quotations omitted.) *State ex rel. Richard v. Bd. of Trustees of the Police & Firemen's Disability & Pension Fund*, 69 Ohio St.3d 409, 411-412, 1994-Ohio-126, 632 N.E.2d 1292.

{¶ 23} Furthermore, "[t]he presumption always is, that every word in a statute is designed to have some effect, and hence the rule that, 'in putting a construction upon any statute, every part shall be regarded, and it shall be so expounded, if practicable, as to give some effect to *every part of it*.'" *Turley v. Turley* (1860), 11 Ohio St. 173, 179, citing *Commonwealth v. Alger* (Mass.1851), 61 Mass. 53, 7 Cush. 53, 89. (Emphasis in original.) See, also, R.C. 1.47(B), which provides that: "[i]n enacting a statute, it is presumed that * * * [t]he entire statute is intended to be effective."

{¶ 24} We find the recent interpretation of the phrases "deliberate removal" and "equipment safety guard" by the Sixth District Court of appeals in *Fickle v. Conversion Technologies Intl., Inc.*, Williams App. No. WM-10-016, 2011-Ohio-2960, instructive. In *Fickle*, the plaintiff was injured "when her left hand and arm became caught in the pinch point of a roller at the rewind end of a Gravure Line adhesive coating machine[, which is equipped with a 'jog/continuous' switch]." Id. at ¶2. The *Fickle* court relied on the plain and ordinary meaning of the undefined terms in R.C. 2745.01(C) and found that:

"'[D]eliberate' as used in the statute means '"characterized by or resulting from careful and thorough consideration – a deliberate decision."' [*Forwerck v. Principle Business Ents., Inc.*, Williams App. No. WD-10-040, 2011-Ohio-489], quoting Merriam-Webster's Collegiate Dictionary (10 Ed.1996) 305.

"* * *

"'[R]emove' is defined in Merriam-Webster's Collegiate Dictionary (10 Ed.2000) 987 as 'to move by lifting, pushing aside, or taking away or off'; also 'to get rid of:   ELIMINATE.'"   Contrary to the assertions of [the employer], however, this does not mean that a guard must 'be taken off of the equipment and made unavailable for use for there to be a rebuttable presumption of intent [to injure].'   Removal of a safety guard does not require proof of physical separation from the machine, but may include the act of bypassing, disabling, or rendering inoperable.

"Combining the above definitions, and considering the context in which the phrase is used in the statute, we find that 'deliberate removal' for purposes of R.C. 2745.01(C) means a considered decision to take away or off, disable, bypass, or eliminate, or to render inoperable or unavailable for use.   Id. at ¶30-32.[6]

"* * *

"With respect to 'equipment safety guard,' * * * [t]he General Assembly has not manifested any intent to give 'equipment safety guard' or its component terms a technical meaning.   There is nothing in the statute or the case law that suggests the General Assembly intended to incorporate any of the various equipment-specific or industry-specific definitions of guard appearing throughout the

---

[6]In footnote 2, the *Fickle* court noted "that R.C. 2745.01(C) does not require proof that the employer removed an equipment safety guard with the intent to injure in order for the presumption to arise.   The whole point of division (C) is to presume the injurious intent required under divisions (A) and (B).   It would be quite anomalous to interpret R.C. 2745.01(C) as requiring proof that the employer acted with the intent to injure in order create a presumption that the employer acted with the intent to injure.   Such an interpretation would render division (C) a nullity."

administrative or OSHA regulations, or for any agency or regulatory measure to be considered a definitional source.

"In some cases, courts have given a technical meaning to an undefined term where the statute regulates a specialized industry or field of practice and the term has acquired a technical or particular meaning in that industry or field. See *Hoffman v. State Med. Bd. of Ohio*, 113 Ohio St.3d 376, 865 N.E.2d 1259, 2007-Ohio-2201, ¶26; *State v. Rentex, Inc.* (1977), 51 Ohio App.2d 57, 365 N.E.2d 1274, paragraph one of the syllabus. But R.C. 2745.01 is not regulatory in nature and is not directed at the removal of an equipment safety guard in any particular industry or from any particular type of machine. Moreover, the term 'guard' has not acquired a particular meaning as a 'barrier' under the regulations. Depending on the type of equipment and industry, acceptable methods of 'guarding' under the regulations include various devices and mechanisms that do not constitute a physical barrier erected between the employee and the danger, such as two-hand controls, pull-back guards, hold-back guards, inch controls, and electronic eye safety circuits. See, e.g., Ohio Adm.Code 4123:1-5-11(E) and 4123:1-5-10(C); Section 1910.255(b)(4), Title 29, C.F.R.

"In *Bishop v. Dayton* (Feb. 5, 1990), 2d Dist. No. 11634, Grady, J., concurring, explained that the principle of construing undefined statutory terms according to their generally accepted meaning should be applied in defining "equipment safety guard" under former R.C. 4121.80(G)(1) * * *:

'The General Assembly has not provided a definition of "equipment safety guard" as that term is used in the statute. A review of the legislative history, staff notes, and Committee Reports, also fail [sic] to provide any guidance or understanding of the meaning of that term. Therefore, it can only be defined according to the common understanding of the meaning of the words used.'

"'Guard' is defined as 'a protective or safety device; specif: a device for protecting a machine part or the operator of a machine.' Merriam-Webster's Collegiate Dictionary, supra, at 516. 'Safety' means 'the condition of being safe from undergoing or causing hurt, injury, or loss.' Id. at 1027, 365 N.E.2d 1274. And 'equipment' is defined as 'the implements used in an operation or activity: APPARATUS.' Id. at 392, 365 N.E.2d 1274." Id. at ¶33-38.

{¶ 25} The appellants in *Fickle* argued that the term equipment safety guard is "'any device designed to prevent injury or to reduce the seriousness of injury.'" The court stated it agreed with appellants that a "safety guard" encompasses something more than an actual physical structure or barrier erected between the employee and the danger, but did not agree with appellants' definition. Id. The *Fickle* court concluded that "as used in R.C. 2745.01(C), an 'equipment safety guard' would be commonly understood to mean a device that is designed to shield the operator from exposure to or injury by a dangerous aspect of the equipment." Id. at ¶43.

{¶ 26} In applying its interpretation of deliberate removal of an equipment safety guard to the facts of the case, the *Fickle* court found that under R.C. 2745.01(C), "[t]he jog control and emergency stop cable * * * were not designed to prevent an operator from encountering the pinch point on the rewind roller and, therefore, are not equipment safety guards[.]" Id. at ¶44.

{¶ 27} While we do not agree with the limitation the *Fickle* court placed on the definitions to those devices that prevent the worker from physical contact with the "danger zone" of the machine and its operation, we find the definitions persuasive.

{¶ 28} We note the Sixth District Court of Appeals examined another employer intentional tort case under R.C. 2745.01(C) in *McKinney v. CSP of Ohio, LLC*, Wood App. No. WD-10-070, 2011-Ohio-3116, and found that the appellant, McKinney, established a rebuttable presumption that the employer removed an equipment safety guard with the intent to injure. Id. at ¶28.

**{¶ 29}** In *McKinney*, a coworker of McKinney's, with over 25 years of experience, advised her supervisor that the machine press she was assigned to was not working properly. The supervisor advised the coworker to continue working the press and that he would call maintenance. However, maintenance never came to check on the machine press. When her shift ended, the coworker forgot to tell McKinney that the press was not working properly. McKinney, who recently started working at CSP, was injured shortly after she began working on the press. Relying on *Forwerck* and *Fickle,* the *McKinney* court stated that:

> **"It is undisputed that the press at issue was improperly programmed at the time of [McKinney's] injury. It is also undisputed that had the press been properly programmed, certain safety devices would have been in place and [McKinney] would not have been injured. To that end, we agree with [McKinney] that the improper programming amounted to the removal of a safety device in that the result was to render the T-stand button and the safety curtains inoperable.**
>
> **"Given the deposition testimony in this case that a supervisor was notified there was a problem with the press, a complaint he either ignored or did not appreciate the seriousness of, and, given the testimony that the workers were told to keep running the press after the complaint, and given the testimony from [the employer's] supervisor that 'none of the right people were present' to ensure that the two safety measures were on press 5 the night of [McKinney's] accident, we find that [McKinney] has established a rebuttable presumption that the removal was committed with intent to injure."** Id. at ¶27-28.

**{¶ 30}** Turning to the instant case, we find that the trial court properly denied L.E. Myers' motion for directed verdict and motion for JNOV. Given the definitions above, we find that the protective rubber gloves and sleeves are equipment safety guards under R.C. 2745.01(C). The protective rubber gloves and sleeves are equipment designed to be

a physical barrier, shielding the operator from exposure to or injury by electrocution (the danger). By virtue of Hewitt's profession, these are the equipment safety guards he has to protect himself while working on energized lines.

{¶ 31} Hewitt, a second-step apprentice, was injured after his supervisor instructed him to work alone and unsupervised in the bucket, without his safety equipment. Hewitt did not wear his equipment safety guards because Law told him that he "shouldn't need no rubbers going up to work on the line." Hewitt expressed his concern about working alone in the bucket, but Law assured him that he would be okay. Cromity confirmed that he and crew foreman Dowdy discussed that the weather was expected to be hot that day and made the decision to instruct the apprentices not to wear their rubber gloves and sleeves since the primary line was de-energized. As a result of this incident, L.E. Myers terminated three employees, Law, Dowdy, and Erman.

{¶ 32} Moreover, according to ALBAT safety regulations, a second-step apprentice lineman should not work with greater than 500 volts of electricity and should not work alone in a bucket. The energized line that Hewitt touched carried approximately 7,200 volts. Ehle testified the work that Hewitt had been assigned required him to wear his rubber gloves and sleeves, regardless of the fact that he was working on de-energized lines because it was possible that the lines could become energized. He acknowledged that working on primary lines without rubber gloves "would be like committing suicide."

{¶ 33} In addition, OSHA regulations require "[e]mployees working in areas where there are potential electrical hazards shall be provided with, and shall use, electrical protective equipment that is appropriate for the specific parts of the body to be protected and for the work to be performed." 29 C.F.R. 1910.335(a)(1)(i).

{¶ 34} Just as in *McKinney*, in the instant case, L.E. Myers' actions cannot be described as reckless. Rather, after thorough consideration, L.E. Myers' supervisors made a deliberate decision to place Hewitt in close proximity to energized wires without wearing protective rubber gloves or sleeves. Their actions amounted to the deliberate removal of an equipment safety guard when they instructed Hewitt, a second-step apprentice lineman, not to wear his protective gloves and sleeves and by sending him alone and unsupervised up in the bucket to work with excessive amounts of electricity, despite the known safety measures and risks.

{¶ 35} Finally, L.E. Myers had the opportunity to rebut the presumption in R.C. 2745.01(C), but instead chose not to present any witnesses. When a rebuttable presumption exists, such presumption prevails until rebutted by evidence to the contrary. See *Biery v. Pennsylvania RR. Co.* (1951), 156 Ohio St. 75, 99 N.E.2d 895, paragraph two of the syllabus ("In an action based on negligence, the presumption exists that each party was in the exercise of ordinary care and such presumption prevails until rebutted by evidence to the contrary). See, also, *Ferrando v. Auto-Owners Mut. Ins. Co.*, 98 Ohio St.3d 186, 2002-Ohio-7217, 781 N.E.2d 927, ¶ 91 (In cases where the insured breaches the subrogation clause in an underinsured motorist policy, "a presumption of prejudice to

the insurer arises, which the insured party bears the burden of presenting evidence to rebut"). Likewise, under R.C. 2745.01(C), a presumption exists that the deliberate removal by an employer of an equipment safety guard was committed with intent to injure another if an injury occurs as a direct result. In the instant case, L.E. Myers failed to sustain its burden and present evidence to the contrary. Thus, the trial court did not err when it denied L.E. Myers' motion for directed verdict and motion for JNOV.

{¶ 36} Accordingly, the first assignment of error is overruled.

Future Damages

{¶ 37} In the alternative, L.E. Myers argues in its second assignment of error that the trial court erred when it denied its motion for JNOV with respect to Hewitt's claim for future damages. L.E. Myers argues the trial court erred when it failed to sever and deduct from the $597,785 judgment those portions of Hewitt's award that represented future economic ($283,500) and non-economic ($15,000) loss. It further argues there was insufficient evidence as to the permanency of Hewitt's injuries to send that issue to the jury. L.E. Myers cites *Day v. Gulley* (1963), 175 Ohio St. 83, 191 N.E.2d 732, in support of its argument.

{¶ 38} In *Day*, the Ohio Supreme Court reviewed the judgment in a personal injury action and held that:

> **"[W]here the plaintiff's injuries are subjective in character and there is no expert medical evidence as to future pain, suffering, permanency of injuries or lasting impairment of health, it is prejudicial error for the trial court to charge the jury in its general instructions that, 'in determining the amount of damages, the jury should consider the nature and extent of the injuries, whether or not the injuries are in all**

**probability permanent or temporary only; the pain and suffering plaintiff has endured and with reasonable certainty will endure in the future.'"** Id. at syllabus.

**{¶ 39}** The *Day* court further stated:

**"'[I]f the injury is of an objective nature (such as the loss of an arm, leg, or other member) the jury may draw their conclusions as to future pain and suffering from that fact alone (the permanency of such injury being obvious); whereas there must be expert evidence as to future pain and suffering or permanency where the injury is subjective in character.'"** Id. at 86, quoting 115 A.L.R. 1149, 1150.

**{¶ 40}** In *Powell v. Montgomery* (1971), 27 Ohio App.2d 112, 119, 272 N.E.2d 906, the Fourth District Court of Appeals interpreted the *Day* decision to mean that "an injury is 'objective' when, without more, it will provide an evidentiary basis for a jury to conclude with reasonable certainty that future damages, such as medical expenses will probably result." Id., citing *Spargur v. Dayton Power & Light Co.* [1959], 109 Ohio App. 37, 163 N.E.2d 786; see, also, *Hammerschmidt v. Mignogna* (1996), 115 Ohio App.3d 276, 281-282, 685 N.E.2d 281 (where this court held "[a]n award of future damages is limited to damages reasonably certain to occur from the injuries").

**{¶ 41}** L.E. Myers contends the injury due to RSD was subjective in nature and there was no expert medical testimony establishing that the pain experienced by Hewitt was permanent in nature or would continue in the future. We disagree.

**{¶ 42}** In the instant case, Hewitt submitted evidence that RSD is an "objective" injury. Doctor Kevin Trangle, M.D. (Dr. Trangle) testified that he is board certified in internal, occupational, environmental, and preventative medicine. The majority of his practice is focused on work-related injuries. We note that L.E. Myers initially retained

Dr. Trangle to examine Hewitt, but later he testified as an expert witness for Hewitt. He confirmed that the BWC allowed claims for: secondary burns to the right forearm, axilla, thumb, and wrist, third degree burns to the right hand and arm, right median nerve injury, major depression, moderate posttraumatic stress disorder, and RSD.

{¶ 43} Dr. Trangle examined Hewitt in September 2008. He testified that he based his diagnosis on his examination of Hewitt and several medical criteria, in conjunction with the 32 records and reports he reviewed for the evaluation, which included injury reports, BWC records, medical records, psychological records, occupational therapy records, and work ability reports.

{¶ 44} Dr. Trangle testified that Hewitt had very dark, thick skin covering his entire right arm, from his wrist to his underarm. The coloration of Hewitt's skin resulted from the burn scarring. Dr. Trangle determined with an objective degree of medical certainty that Hewitt suffers from RSD as a result of touching the energized wire. He testified that RSD is caused by a break in the "feedback loop" from the nerves at the injury to the spinal cord causing people to stop using their extremity. Over time, people with RSD suffer from changes in skin color, definition, and elasticity, swelling, and atrophy. In addition, the victim can suffer intractable pain, which "doesn't respond easily to medication or other methods of treatment."

{¶ 45} Hewitt suffered injuries to his right hand, wrist, arm, and underarm in the form of burn scarring and limited mobility, with the permanency of those injuries being obvious. Furthermore, expert testimony from Dr. Trangle established the objective

nature of Hewitt's injuries. Thus, Hewitt provided an evidentiary basis for a jury to conclude with reasonable certainty that future damages will probably result.

{¶ 46} Based on the foregoing, we are unpersuaded that the trial court erred in allowing Hewitt's claim for future damages to go to the jury and in refusing to grant a JNOV on the issue of future damages.

{¶ 47} Thus, the second assignment of error is overruled.

{¶ 48} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, ADMINISTRATIVE JUDGE

PATRICIA A. BLACKMON, J., and
FRANK D. CELEBREZZE, JR., J., CONCUR