[Cite as *Rodriguez v. Catholic Charities Corp.*, 2022-Ohio-1317.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

MICHELLE RODRIGUEZ,  :

    Plaintiff-Appellee,  :

                                        No. 110743

    v.  :

CATHOLIC CHARITIES
CORPORATION, ET AL.,  :

    Defendants-Appellants.  :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED AND REMANDED
**RELEASED AND JOURNALIZED:** April 21, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-19-909566

---

### *Appearances:*

Deratany & Kosner, Jay Paul Deratany, and Thomas
Stewart; Randazzo Law, L.L.C., and Russell A. Randazzo;
Paul W. Flowers Co., L.P.A., Paul W. Flowers, and Louis
E. Grube, *for appellee*.

McDonald Hopkins, LLC, Richard H. Blake, Joseph M.
Muska, and Theresa M. Lanese; Patton & Ryan and John
W. Patton, Jr., pro hac vice; Bonezzi Switzer Polito &
Hupp Co. L.P.A., Beth A. Sebaugh, and Ronald A.
Margolis, *for appellants*.

CORNELIUS J. O'SULLIVAN, JR., J.:

{¶ 1} Defendants-appellants Catholic Charities Corporation and Catholic

Charities Diocese of Cleveland (collectively "Catholic Charities") appeal from the

trial court's August 11, 2021 judgment entry denying Catholic Charities' motion for summary judgment as to statutory immunity. After a thorough review of the facts and law, we affirm and remand.

**Factual and Procedural History**

{¶ 2} Plaintiff-appellee Michelle Rodriguez ("appellee"), as administrator of the estate of J.R., deceased, initiated this action against several defendants, including Catholic Charities. The record demonstrates that J.R., a developmentally disabled child, died in September 2017. The child's death was the result of severe malnutrition. The child also suffered physical abuse by his mother and her boyfriend. The child's mother and her boyfriend were indicted and convicted on criminal charges stemming from the child's death.

{¶ 3} The record demonstrates that annually, beginning in 2013, defendant Bright Beginnings (formerly known as "Help Me Grow"), Educational Service Center of Cuyahoga County ("ESC"),[1] and Catholic Charities began a long-term relationship by entering into a series of one-year contracts to cover the years 2014 through 2018. The contract language is nearly identical for each year. Each contract was fully executed by the parties. Pursuant to the contracts, Catholic Charities, which is identified as "the Agency," agreed to provide family education, support, and advocacy through regular home visits to qualified families. Each contract states not only that each party was an independent contractor, but also that each party was not

---

[1] ESC is not a party to the action.

to be considered agents, employees, or representatives of the other. Furthermore, the agreement notes, "The ESC recognizes [Catholic Charities] as an independent contractor in carrying out its duties under this contract." There is no evidence that either party ever contemplated altering these very specific terms.

{¶ 4} From 2013 through 2017, defendant Nancy Caraballo ("Caraballo") was a human service worker for Catholic Charities. Caraballo was a "parent educator" providing parenting education services to third-party defendant Larissa Rodriguez, the decedent's mother. It is undisputed that the decedent, J.R., was never enrolled in the Parents as Teacher's program. It is further undisputed that Caraballo committed food stamp ("EBT") fraud with the deceased child's mother and falsified governmental records indicating she provided the Parents as Teachers program services to the mother and her children.

{¶ 5} Appellee initiated this action in October 2020. In March 2021, Catholic Charities filed a motion for summary judgment pursuant to Civ.R. 56(C), claiming that they were entitled to statutory immunity. Appellee opposed the motion.

{¶ 6} The five relevant contracts entered into by ESC, Bright Beginnings, and Catholic Charities were submitted as evidence below. The parties also submitted the following deposition transcripts: (1) Dr. Robert Mengerink, superintendent of ESC; (2) Karen Mintzer, director of Bright Beginnings; (3) Thomas Wetzel, parents as teachers program manager for Bright Beginnings; and (4) DeEbony Pelzer, Catholic Charities' parent educators manager.

{¶ 7} On August 11, 2021, the trial court denied Catholic Charities' motion for summary judgment. Catholic Charities appeals and presents the following assignment of error for our review: "Whether the trial court erred in denying Defendant/Appellant Catholic Charities Corporation's Motion for Summary Judgment on Statutory Immunity."

**Law and Analysis**

**Jurisdiction**

{¶ 8} As an initial matter, we consider our jurisdiction to hear this appeal. Ordinarily, an order denying a motion for summary judgment is not a final, appealable order. *See, e.g., Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, ¶ 9; *Celebrezze v. Netzley*, 51 Ohio St.3d 89, 90, 554 N.E.2d 1292 (1990). However, R.C. 2744.02(C) states: "An order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order." The Supreme Court of Ohio has held that "when a trial court denies a motion in which a political subdivision or its employee seeks immunity under R.C. Chapter 2744, that order denies the benefit of an alleged immunity and thus is a final, appealable order pursuant to R.C. 2744.02(C)." *Hubbell* at ¶ 27. Thus, R.C. 2744.02(C) grants appellate courts jurisdiction to review a trial court order denying a motion for summary judgment based on immunity.

**Standard of Review**

{¶ 9} This court reviews a trial court's ruling on a motion for summary judgment de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.

{¶ 10} Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law.

{¶ 11} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party must then point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. If the nonmoving party fails to meet this burden, summary judgment is appropriate. *Id.*

{¶ 12} Thus, this court must conduct a "de novo review of the law and facts" to determine whether (1) only questions of law remain, which this court may then resolve, or (2) a genuine issue of material fact exists, requiring a remand to the trial

court for "further development of the facts necessary to resolve the immunity issue."
*Hubbell*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, at ¶ 21.

{¶ 13} We are mindful that the Supreme Court of Ohio noted in *Peters v. B. & F. Transfer Co.*, 7 Ohio St.2d 143, 219 N.E.2d 27 (1966), "'[u]nder our law it is just as pernicious to submit a case to a jury and permit the jury to speculate with the rights of citizens when no question for the jury is involved, as to deny to a citizen his [or her] trial by jury when he [or she] has the right.'" *Id.* at paragraph eight of the syllabus, quoting *J. C. Penney Co. v. Robison,* 128 Ohio St. 626, 193 N.E. 401 (1934), paragraph six of the syllabus. Indeed, the Ohio Supreme Court has indicated that granting of summary judgement "should be encouraged in proper cases." *North v. Pennsylvania RR. Co.*, 9 Ohio St.2d, 169, 171, 224 N.E.2d 757 (1967).

**Statutory Immunity of Political Subdivision and Its Employees**

{¶ 14} Ohio's Political Subdivision Tort Liability Act, codified in R.C. Chapter 2744, "'sets forth a comprehensive statutory scheme for the tort liability of political subdivisions and their employees.'" *McConnell v. Dudley*, 158 Ohio St.3d 388, 2019-Ohio-4740, 144 N.E.3d 369, ¶ 20, citing *Supportive Solutions, L.L.C., v. Electronic Classroom of Tomorrow*, 137 Ohio St.3d 23, 2013-Ohio-2410, 997 N.E.2d 490, ¶ 11.

{¶ 15} Catholic Charities is not a political subdivision. *See* R.C. 2744.01(C)(2) (for nonexhaustive list of qualifying political subdivisions). Catholic Charities does not claim to be a political subdivision. Rather, it contends that it was an agent or employee of ESC, which is a political subdivision and, as such, is entitled to

immunity.[2]   Catholic Charities also contends that ESC and Bright Beginnings operated as a joint enterprise.

{¶ 16} R.C. 2744.03(A)(6) provides qualified immunity to employees of political subdivisions.   Under R.C. 2744.03(A)(6) an employee of a political subdivision is immune from liability unless one of the following applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code.

{¶ 17} For the reasons discussed below, Catholic Charities was not an employee of ESC or Bright Beginnings.  Further, the record demonstrates that ESC and Bright Beginnings operated as separate and distinct entities.

{¶ 18} Each of the five consecutive one-year contracts specify that Catholic Charities was performing its services for Bright Beginnings as an "independent contractor."   Furthermore, each of the one-year agreements specify that neither party is an agent, employee, or representative of the other.  There is no evidence that either party ever contemplated altering these very specific terms.

{¶ 19} The contract language for each of the contracts is nearly identical. Catholic Charities agreed to "provide family education, support and advocacy through regular home visits."  Article 4 of the contracts set forth Catholic Charities' duties.  Section 4.1 is titled "Autonomy" and provides:

---

[2] Appellee concedes that ESC is a political subdivision.  *See* appellee's brief, pg. 17.

Each party hereto shall be deemed an independent Contractor, and neither party is nor shall be considered an agent, employee, or representative of the other. [Catholic Charities] is a fully independent and autonomous Contractor and retains the ultimate responsibility for the care and service of families to whom services are rendered under this Contract. The ESC recognizes [Catholic Charities] as an independent Contractor in carrying out its duties under this Contract and, as a result, the ESC shall have no liability for undelivered services or any unpaid claims against [Catholic Charities].

{¶ 20} Section 4.5 governs "Staffing and Personnel Requirements." Under Section 4.5.1 Catholic Charities was required to "provide adequate numbers of service and supervisory staff with all applicable local and state training adequate to meet Contract requirements." Additionally, that section provides that Catholic Charities

shall be solely responsible for the employment or contracting of such individuals, including the responsibility for recruitment, promotion, payment of wages, pension, benefits, layoff, discipline, and termination, and [Catholic Charities] shall comply with all applicable laws and regulations hereto. [Catholic Charities] will ensure that all Parent Educators have completed trainings and are credentialed as required by [Bright Beginnings] policy, guidelines, and procedures. [Catholic Charities] shall ensure all staff meet the minimum qualifications for education, experience, training, and clinical supervision in accordance to guidance from Bright Beginnings and Parents as Teachers National Center.

[Catholic Charities] shall implement strategies to manage the caseload with staffing turnover and/or absences including but not limited to vacations, illness, Family Leave Medical Act (FMLA), and resignations.

{¶ 21} Article 9 of the contracts governs "Insurance," and requires Catholic Charities to "obtain insurance in accordance with the requirements of this Contract." The required insurance includes coverage for general liability, professional liability,

employers' liability, automobile, workers' compensation, and employee dishonesty. ESC was named as an "additional insured" for all coverage under Article 9.

{¶ 22} Article 10 of the series of contracts outlines the indemnification responsibilities of the parties. Section 10.1 states that

> in addition to the insurance coverage required in Article 9, [Catholic Charities] hereby agrees to indemnify and hold harmless the ESC for any and all costs and expenses associated with carrying out [Catholic Charities'] duties under this Contract * * * including, but not limited to all losses occasioned by [Catholic Charities] failure to acquire insurance coverage as required hereunder.

The various insurance and indemnification requirements would lose their common meaning and purpose if the parties were also agreeing that Catholic Charities was an agent of Bright Beginnings and protected by sovereign immunity.

{¶ 23} Section 10.1 goes on to provide that Catholic Charities

> shall indemnify the ESC to the extent permitted by law, against and hold the ESC harmless from any and all claims, suits, damages (including compensatory and punitive damages), or causes of action against the ESC which are the direct and proximate result of negligent and/or intentional acts and/or omissions on the part of [Catholic Charities], arising out of the performance of such duties by [Catholic Charities] * * *.

{¶ 24} Under Section 11.1 of the contracts, the contracts "may be terminated by either party at any time for cause or for no cause by providing the other party with notice in writing not less than 30 days prior to terminating this Contract." Further, under Section 11.3 the contracts could be "amended or modified by agreement of the parties in writing."

{¶ 25} The five consecutive contracts in question further outline the duties and responsibilities of the parties and provide a roadmap as to the method by which Catholic Charities was to provide its services.

{¶ 26} In addition to the above-referenced contractual language, the testimonial evidence supports the finding that Catholic Charities operated as an independent contractor in administering the "Parents as Teachers" program.

{¶ 27} Dr. Mengerink, the superintendent of ESC, testified that Catholic Charities was independently carrying out its duties under the contract and ESC was not involved in the day-to-day operations or supervision of Catholic Charities. Likewise, Mintzer, the director of Bright Beginnings, testified that her organization had no control over Catholic Charities. Wetzel, the parents as teachers program manager for Bright Beginnings testified that Bright Beginnings' role was to ensure that Catholic Charities met the "essential requirements" of the Parents as Teachers program. According to Wetzel, Bright Beginnings did not "get into the substance of the work that the parent educators were doing at Catholic Charities."

{¶ 28} Pelzer, the Catholic Charities' parent educators manager, testified that she was responsible for "[s]upervision, maintaining the contract deliverables, reading through progress notes, ensuring that the things that the * * * parent educators stated that they did at the home visit was entered into the system." Pelzer further testified that she was responsible for doing the performance evaluations for the parent educators and managing the "day-to-day staff calling off, any disciplinary actions." The record demonstrates that defendant Caraballo, the Catholic Charities

employee assigned to J.R.'s case, copied and pasted the same information over and over for her visit entries. Pelzer admitted that she never questioned defendant Caraballo about her duplicative entries.

{¶ 29} Both defendant Caraballo and Pelzer testified that they were paid by Catholic Charities. Further, they admitted that Caraballo was hired by Catholic Charities, fired by Catholic Charities, and had her pay set by Catholic Charities.

{¶ 30} Thus, the five consecutive yearly contracts and the deposition testimonies demonstrate that Catholic Charities performed its services as an independent contractor. Neither Bright Beginnings nor ESC controlled Catholic Charities' employees or operations.

{¶ 31} Moreover, Catholic Charities fails to meet the definition of an "employee" of a political subdivision. R.C. 2744.03(A)(6) defines an employee of a political subdivision as follows:

> "Employee" means an officer, agent, employee, or servant, whether or not compensated or full-time or part-time, who is authorized to act and is acting within the scope of the officer's, agent's, employee's, or servant's employment for a political subdivision. *"Employee" does not include an independent contractor*.

(Emphasis added.) *See also Leath v. Cleveland*, 8th Dist. Cuyahoga No. 102715, 2016-Ohio-105. In *Leath*, a property owner brought a wrongful demolition suit against the city of Cleveland and the independent contractor construction company and owner of the company the city hired to demolish the building on the plaintiff's property. The trial court found that the construction company and its owner were not liable on the plaintiff's claims based on political subdivision immunity. This

court found that holding to be in error, stating, "R.C. 2744.02(A) applies only to a political subdivision and its employees. * * * [I]mmunity may not attach to independent contractors * * *." *Id.* at ¶ 27.

{¶ 32} The Supreme Court of Ohio considered the definition of employee under the political subdivision immunity act in *Wilson v. Stark Cty. Dept. of Human Servs.*, 70 Ohio St.3d 450, 639 N.E.2d 105 (1994). In *Wilson*, the plaintiffs sued several county departments of human services for allegedly mishandling the placement of adopted children. The trial court granted summary judgment in favor of the departments on the ground of political subdivision immunity. The appellate court reversed and held that the departments could be held liable as "an agent or employee" of the political subdivision.

{¶ 33} The Supreme Court disagreed and held that a county department of human services could not be classified as an "employee" under R.C. 2744.01(B) because that section limits the term "employee" to "an individual natural person." *Wilson* at 453. The court reasoned that "[i]t would be awkward at best to contemplate a part-time human services department, or a department acting within the scope of 'his' [or her] employment." *Id.*[3]

{¶ 34} Catholic Charities contends that because the term "independent contractor" is not defined in R.C. Chapter 2744, "Ohio courts apply common law principles regarding both employment and agency relationships for the test to

---

[3] The court found that although the departments were not "employees" they were a component of the county government itself and therefore entitled to immunity as a political subdivision.

distinguish an employee/agent from an independent contractor." Catholic Charities cites *Trucco Constr. Co. v. Fremont*, 6th Dist. Sandusky No. S-12-007, 2013-Ohio-415, in support of its contention.

{¶ 35} In *Trucco*, the Sixth District noted that after *Wilson* was decided R.C. 2744.01(B) was amended to replace the phrase "within the scope of his [or her] employment" with the phrase "within the scope of the officer's, agent's, employee's, or servant's employment." *Trucco* at ¶ 17. According to the Sixth District, "the holding in the *Wilson* case has been abrogated." *Trucco* at *id*. We disagree. We believe that if the General Assembly had intended to abrogate *Wilson* it would have explicitly stated that "employee" includes business entities, groups, and organizations. The amendment merely appears to reflect a change to gender neutral language.

{¶ 36} Thus, under the authority of *Wilson*, Catholic Charities does not qualify as an employee.

{¶ 37} We are not persuaded by Catholic Charities' contention that the "label" as an independent contractor in the contracts should not define its relationship with ESC and Bright Beginnings. In support of its contention, Catholic Charities cites *Slauter v. Klink*, 2d Dist. Montgomery No. 18150, 2000 Ohio App. LEXIS 3716 (Aug. 18, 2000), and *Walker v. Lahoski*, 9th Dist. Summit No. 19293, 1999 Ohio App. LEXIS 3435 (July 28, 1999). Neither of those cases consider political subdivision immunity. Rather, they deal with employee injuries and whether they are compensable under workers' compensation. Even if we were to

put aside the "independent contractor" label and the specific limitations contained in the five consecutive yearly contracts and the deposition testimony and examine the relationship, it does not support Catholic Charities' agency theory.

{¶ 38} Catholic Charities cites *Gillum v. Indus. Comm.*, 141 Ohio St. 373, 48 N.E.2d 234 (1943), in support of its contention that its relationship with ESC and Bright Beginnings was an agency, rather than an independent contractor, relationship. In *Gillum*, the Supreme Court of Ohio stated that the following factors can be considered in determining status as an independent contractor versus an agent:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer; and

(i) whether or not the parties believe they are creating the relationship of master and servant.

*Id.* at 381-382.

{¶ 39} Upon review, application of the relevant *Gillum* factors demonstrate that Catholic Charities was an independent contractor. Wetzel, the Bright Beginnings manager for the Parents as Teachers program, testified that Bright Beginnings did not "get into the substance of the work that the parent educators were doing at Catholic Charities." Bright Beginnings director Mintzer also testified that "Catholic Charities and Bright Beginnings were independent agencies," that "neither one was the agent of the other," and that "Bright Beginnings did not have authority to direct the day-to-day operations of Catholic Charities."

{¶ 40} Dr. Mengerink, the superintendent of ESC, testified that ESC had "no role or responsibility for the day-to-day operation of Catholic Charities" under the contracts. According to Dr. Mengerink, during the relevant contract years, ESC was never "involved in the day-to-day operations of Catholic Charities' business," nor did it have the authority to "control the details of Catholic Charities' work," or their "goals and means of getting that work done." Dr. Mengerink testified that ESC did not have the authority to "supervise" or to "hire or fire Catholic Charities' employees." Furthermore, each of the separate five yearly contracts provided that Catholic Charities was solely responsible for staffing and personnel.

{¶ 41} Thus, there was other evidence in the record that supports the independent contractor title in addition to the contracts under which Catholic Charities agreed, *five times*, that it was "a fully independent and autonomous Contractor" and was "deemed an independent Contractor" for purposes of carrying

out Parents as Teachers services. Furthermore, the contracts specifically state that "the ESC shall have no liability for undelivered services or unpaid claims against [Catholic Charities] by third parties."

{¶ 42} Moreover, Catholic Charities paid Caraballo and had sole control over hiring and firing her. The record also demonstrates that ESC and Catholic Charities engaged in distinct occupations or businesses. Dr. Mengerink testified that ESC "provides individual support for area school districts," while Pelzer testified Catholic Charities' role with the Bright Beginnings program was to "provide home visitation services to families, birth to age three."

{¶ 43} The last factor under *Gillum*, whether the parties believed they were creating a master and servant relationship, is best evidenced by the contract themselves. Five times Catholic Charities entered into a contract in which it was identified as an independent contractor. It had the right to terminate, amend, or modify these contracts five times, and never did. The record evidences that it was the parties' intent that Catholic Charities perform its duties as an independent contractor.

**Bright Beginnings Not a Political Subdivision**

{¶ 44} In addition to the contractual language and other evidence demonstrating that Catholic Charities was an independent contractor, Catholic

Charities has failed to establish that Bright Beginnings is even a political subdivision capable of conferring immunity to its agents.

{¶ 45} R.C. Chapter 2744 sets forth a three-tiered method for determining a political subdivision's immunity from liability. Under the first tier, R.C. 2744.02(A)(1) sets out a general rule that political subdivisions are not liable in damages. In order to meet the first tier, the defendant must establish that it is a political subdivision. *Young v. Genie Industries United States*, 8th Dist. Cuyahoga No. 89665, 2008-Ohio-929, ¶ 13, citing *Elston v. Howland Local Schools*, 113 Ohio St.3d 314, 317, 2007-Ohio-2070, 865 N.E.2d 845. Thus, to pursue its agency theory of liability, Catholic Charities would have to demonstrate that Bright Beginnings is a political subdivision or that Bright Beginnings is part of ESC. It fails to establish either.

{¶ 46} Mintzer, the director of Bright Beginnings, testified that Bright Beginnings is a not-for-profit organization that provides home visiting services in Cuyahoga County. She further testified that there is no governmental supervision — state or county wise — over the organization. According to Mintzer, Bright Beginnings is only affiliated with the national Parents as Teachers organization. The record fails to demonstrate that Bright Beginnings is a political subdivision.

{¶ 47} In regard to Catholic Charities' contention that Bright Beginnings and ESC (a political subdivision) are one in the same, Dr. Mengerink, the superintendent of ESC, testified that ESC's relationship with Bright Beginnings is merely to act as the organization's "fiscal agent." Dr. Mengerink explained that its role as fiscal agent

was to ensure that ESC "pay[s] the bills" for Bright Beginnings. Dr. Mengerink testified that Bright Beginnings "acted independent of and [is] considered independent of ESC." He maintained that Bright Beginnings is not a "subsidiary" of ESC. The preamble to the contracts also describes ESC's role as the "administrative and fiscal agent for Bright Beginnings." Contracts, pg. 1.

{¶ 48} Catholic Charities contends that ESC exercised agency-like control of Catholic Charities as evidenced by the requirement that Catholic Charities had to undergo certain trainings and Catholic Charities was required to enter certain data in a "visit tracker system." Catholic Charities cites *Doyle v. Mayfield*, 48 Ohio App.3d 113, 548 N.E.2d 326 (12th Dist.1988), in support of its contention.

{¶ 49} *Doyle* involved a workers' compensation claim, where the plaintiff, an attorney, sought benefits for an injury that occurred on the job. The plaintiff asserted that she was an employee of the defendant union at the time of the injury. The defendant claimed that the plaintiff was merely a volunteer. The court noted that the defendant union sent the plaintiff to their training sessions so that she could "learn the proper procedure on how to represent claimants" from another of the union's lawyers and thus reasoned that the defendant union was exercising control over the manner in which the plaintiff represented claimants. *Id*. at 115.

{¶ 50} This case is distinguishable from *Doyle*. The record in this case demonstrates that Catholic Charities' employees attended Parents as Teachers trainings that were run by the private company Parents as Teachers. Neither ESC nor Bright Beginnings controlled, operated, or owned the required trainings.

{¶ 51} We do not find merit to Catholic Charities' contention that the requirement that Catholic Charities enter data into a "visit tracker system" is sufficient to demonstrate that Catholic Charities acted as agents of Bright Beginnings or ESC. The tracker system merely documented that Catholic Charities was doing the work it was supposed to be doing.

{¶ 52} Catholic Charities cites *The Miller Plumbing & Heating Co. v. Village of Chagrin Falls*, 8th Dist. Cuyahoga No. 73592, 1998 Ohio App. LEXIS 5902 (Dec. 10, 1998), in contending that it performed "governmental-related functions." *Miller Plumbing* is distinguishable from this case. In *Miller Plumbing*, this court held that an engineering firm, by and through a designated employee representative, that was formally appointed to the office of the "Village Engineer" under the Ohio Revised Code, was an employee of the village entitled to immunity. *Id.* at 16-17. Catholic Charities and its employees did not receive any appointments from a governmental entity in this case. Thus, its reliance on *Miller Plumbing* is unavailing.

{¶ 53} Likewise unavailing is Catholic Charities' reliance on 1987 Ohio Atty.Gen.Ops. No. 87-102. Catholic Charities contends that the opinion provides that a "contract between the political subdivision and nonprofit that provides services to the political subdivision creates an employment or agency relationship." Catholic Charities' brief, p. 19-20.

{¶ 54} The opinion considered whether a nonprofit organization that contracts with a county public defender for services that the public defender's office is required or permitted to provide is a contract with a political subdivision. The

attorney general opined that "[f]or purposes of this opinion" it was. 1987 Ohio Atty.Gen.Ops. No. 87-102, at 2-682.

{¶ 55} The opinion noted that generally employees of a private nonprofit organization "providing public defender services under contract * * * [are] independent contractor[s], and an employee of that organization is not an 'officer, agent, employee, or servant' of a political subdivision for purposes of R.C. Chapter 2744." *Id*., quoting R.C. 2744.01(B).

{¶ 56} The attorney general noted "however, it is possible for a private entity to designated as an agent of a political subdivision, thereby bringing within the provisions of R.C. Chapter 2744 persons who manage or work for the private entity, if they perform functions on behalf of the political subdivision." *Id*. at 2-682-2-683. The opinion simply does not stand for Catholic Charities' proposition that a "contract between the political subdivision and nonprofit that provides services to the political subdivision creates an employment or agency relationship." Catholic Charities' brief, p. 19-20.

**R.C. 2744.02(B) Exceptions Inapplicable**

{¶ 57} We next consider Catholic Charities' argument that appellee failed to show any exception to immunity pursuant to R.C. 2744.02(B) exists. That section of the code is relative to circumstances where the entity at question has been determined to be a political subdivision and the ensuing question is whether an exception to immunity applies. Catholic Charities is not claiming direct immunity. Rather, it is claiming that it was an employee of entity that is a political subdivision.

Exceptions to immunity for an employee of a political subdivision are found in R.C. 2744.03(A)(6). *See Lambert v. Clancy*, 125 Ohio St.3d 231, 2010-Ohio-1483, 927 N.E.2d 585, 10 ("For claims against individual employees, the three-tiered analysis used to determine whether a political subdivision is immune is not used," instead, employee immunity is analyzed under R.C. 2744.03(A)(6)). Thus, the exceptions to immunity under R.C. 2744.02 are irrelevant to this case.

**App.R. 23**

{¶ 58} Finally, we consider appellee's request, made in her brief, that we award her attorney fees and costs for what she contends is Catholic Charities' frivolous appeal.

{¶ 59} App.R. 23 provides that "[i]f a court of appeals shall determine that an appeal is frivolous, it may require the appellant to pay reasonable expenses of the appellee including attorney fees and costs." A frivolous appeal is an appeal that presents no reasonable question for review. *Cusick v. N. Coast Family Found.*, 8th Dist. Cuyahoga No. 73458, 1998 Ohio App. LEXIS 3043 (July 2, 1998), citing *Danis Montco Landfill Co. v. Jefferson Twp. Zoning Comm.*, 85 Ohio App.3d 494, 620 N.E.2d 140 (2d Dist.1993). The decision of whether to award attorney fees for frivolous conduct rests within the sound discretion of this court. *Cominsky v. Malner*, 11th Dist. Lake No. 2002-L-103, 2004-Ohio-2202, ¶ 26, citing *Kondrat v. Byron*, 11th Dist. Lake No. 12-213, 1988 Ohio App. LEXIS 4279 (Oct. 28, 1988).

{¶ 60} Although we are affirming and remanding the decision of the trial court, we find reasonable questions were presented for review and decline to impose

fees or costs as a sanction with respect to this appeal. Appellee's request is therefore denied.

**Conclusion**

{¶ 61} After our de novo review of the law and facts, we determine that only an issue of law remained; that is, whether Catholic Charities established that it was an employee of a political subdivision entitled to immunity under R.C. 2744.02(A) as a matter of law. It has not. Accordingly, Catholic Charities' sole assignment of error is overruled.

{¶ 62} Judgment affirmed and remanded.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

CORNELIUS J. O'SULLIVAN, JR., JUDGE

ANITA LASTER MAYS, P.J., and
JAMES A. BROGAN, J.,* CONCUR

(*Sitting by assignment: James A. Brogan, J., retired, of the Second District Court of Appeals.)